PREBLE J. did not attend at this, nor any of the succeeding terms on the spring circuit, by reason of indisposition.

THE PROPRIETORS OF THE KENNEBEC PURCHASE *v.* LABOREE & ALS.

If a man enters upon land under a deed duly registered, though from one having no legal title to the land, and has a visible possession, occupancy and improvement of only a part of it, such occupation and improvement, unless controled by other facts, is a disseisin of the true owner, as to the whole tract;—because the extent and nature of his claim may be known by inspection of the public registry.

The *Stat.* 1821. *ch.* 62. *sec.* 6. was enacted to abolish the distinction, existing at common law, between a possession under a *deed recorded,* and a possession without such title on record; attaching, as against the demandant, the same legal consequences to both.

So far as this section is *retrospective,* it is unconstitutional, and cannot be carried into effect, because it would impair vested rights.

THIS was a writ of entry, in which were demanded 200 acres of land in *Whitefield,* on the east side of *Sheepscut* river, 100 rods wide, and extending back from the river one mile; the demandants counting on their own seisin within 30 years and a disseisin by the tenants.

As to a part of the premises adjoining the river, being about twenty-five acres of the front of the lot, the tenants pleaded a

disclaimer, which was admitted. The title to the residue was tried upon the issue of *nul disseisin.*

The demandants gave in evidence the patent from the governor and council of *Plymouth* to *Antipas Boyes* and others, dated *October* 27, 1661, and it was admitted that the demandants had all the title conveyed by that patent, which was subsequently confirmed to the demandants by the Commonwealth of *Massachusetts* by deed dated *February* 18, 1789. They also read the deposition of *Ephraim Ballard,* a surveyor appointed by the committee for the sale of eastern lands, and by a committee of the demandants, in 1798, to ascertain and mark the true southern boundary of the *Kennebec* purchase, coinciding with and passing through the utmost limits of *Cobbessecontee,*—testifying that he did so ascertain and mark that boundary, at a red oak tree on the west bank of *Kennebec* river; the line running east-south-east, and west-south-west, and terminating fifteen miles from the river;—and it was proved that the demanded premises are within fifteen miles of the river, and north of the *Ballard*-line.

The tenants then proved that one *Nathan Longfellow* went upon the front of this lot 46 or 47 years ago, cleared the land, and erected a house on the part disclaimed; and about 42 years ago erected another house on the front of the part defended, where he dwelt until he sold the land in *July* 1794 to his son *Jacob,* under whom the tenants derived their title by regular conveyances;—that he continued to enlarge his improvements from year to year, so that he had cultivated and enclosed with fences about one half of the lot from the river eastward, as long since as thirty years before the commencement of the action;—that soon after *Longfellow* entered upon this lot, it was known that there were marked trees at the northeast and southeast corners of the lot demanded, which *Longfellow* claimed as the corners of his lot, and that for more than thirty years before the commencement of this action, there were marked trees on the lines running from these corners to the river, and also across the head of the lot, which he claimed as the lines of his lot;—that he cut and took away the timber on the back end of the lot, as he wanted it; and for thirty years before the action was brought, he had cut wood and tim-

ber on any part of the lot as he had occasion ; forbidding others who were in that vicinity from cutting on his lot, the lines of which were well known and recognized as the bounds of *Long-fellow's* lot ;—and that he paid all the taxes assessed thereon.

The easterly half of the demanded premises had never been fenced, nor cleared.

Upon this evidence the Judge who presided at the trial instructed the jury, that if, from the facts proved, they were satisfied that the " possession, occupation, and improvement" by *Nathan Longfellow* of the premises defended, for more than thirty years before the commencement of the action, was, agreeably to *Stat.* 1821. *ch.* 62. *sec.* 6., " open, notorious and " exclusive, comporting with the ordinary management of sim- " ilar estates in the possession and occupancy of those who " have title thereunto, or satisfactorily indicative of such exer- " cise of ownership as is usual in the improvement of a farm " by its owner;" and that the same occupancy, possession and improvement was continued by the tenant and the intermediate grantees of said *Longfellow* up to the time of the commencement of this action, they ought to return their verdict for the tenant. And he further instructed them that if they believed the witnesses, the tenant had entitled himself to their verdict upon these principles.

A verdict was thereupon returned for the tenant, subject to the opinion of the whole Court upon the correctness of these instructions.

The question was argued at *May* term, 1822, by *Orr* and *R. Williams,* for the demandants, and *Stebbins* and *Barnard,* for the tenants.

*For the demandants* it was contended—1. That upon the facts proved, the tenants shewed no title by disseisin to *any* part of the lot. Their claim is not to be favoured. It was hostile in its inception. It is essential that they should shew that *Nathan Longfellow* entered *under claim or colour of title,* that his entry was not congeable, and that it was an actual ouster of the freehold. *Brandt v. Ogden,* 1 *Johns.* 156. *Jackson v. Sharp,* 9 *Johns.* 163. *Smith v. Burtis,* 9 *Johns.* 174. *Jackson v. Ellis,* 13 *Johns.* 118. *Jackson v. Belden,* 16 *Johns.* 293. *Jackson v.*

*Waters,* 12 *Johns.* 365. These cases agree with the ancient decisions. *Co. Lit.* 181. *a.* 277. *a.* 2 *Bac. Abr. Dissesin,* A. 1 *Salk.* 246. 3 *Bl. Com.* 169. *Atkyns v. Horde,* 1 *Burr.* 61. *Cowp.* 689. *Blunden v. Baugh, Cro. Car.* 302.

2. That if the facts shew a title in the tenants by disseisin to any part of the premises, this extends only to that part of which they had the visible occupation by inclosure in fences. *Jackson v. Schoonmaker,* 2 *Johns.* 230. *Prop'rs Ken. Pur. v. Call,* 1 *Mass.* 483. *Prop'rs Ken. Pur. v. Springer,* 4 *Mass.* 416. *Brown v. Porter,* 10 *Mass.* 93.

3. That the *Stat.* 1821. *ch.* 62. *sec.* 6. establishing a new doctrine of disseisin, must be construed prospectively,—or it is unconstitutional, and void. No legislature has a right to declare what the law *was,*—but only what it *shall be.* If they choose to adopt the mischievous principle of putting disseisors on an equal footing with the lawful owners of land, permitting them to enter on one parcel in the name of all the vacant lands in the same county, it is a power which they can exercise only in subserviency to rights already vested, and to contracts already in force. These are beyond the control of any legislature, under any form of free government, whether protected by the express letter of the constitution or not. Yet the section on which the tenants rely is pressed into their service, to the entire subversion of the demandants' vested right to enter upon the east end of the lot, which was never fenced; which right they had enforced by this action, before the statute was enacted. 6 *Bac. Abr. Statute c.* *Ogden v. Blackledge,* 2 *Cranch* 272. *Dash v. Van Kleeck,* 7 *Johns.* 477, 500. *Society v. Wheeler,* 2 *Gal.* 105. *King v. Dedham Bank,* 15 *Mass.* 447. *Holden v. James,* 11 *Mass.* 396. 3 *Dal.* 386. The power of the legislature to confirm the doings of public officers—to suspend the operation of the general statute of limitations—to provide new remedies for the enforcement of existing rights, &c.—which has been exerted in numerous instances, rests upon other principles, and is not contested.

*For the tenants* it was insisted—1. That the statute was not at variance with the common law. In effect it merely declares that to constitute a disseisin, a *fence* is not necessary;—that

possession *as a farm* is sufficient. It leaves to the tenant the burden of proving the extent of his possession ; requiring him to shew that he conducts, *in all things,* as an owner conducts with his farm. *Mill Corporation v. Bulfinch,* 6 *Mass.* 234. *Cutts v. Spring,* 15 *Mass.* 135. *Small v. Procter,* 15 *Mass.* 498. 3 *Bl. Com.* 177. It is a statute which is to be favourably regarded. 3 *Bl. Com.* 168. *Atkyns v. Horde,* 1 *Burr.* 60. 3 *Cruise's Dig.* 564. *Cummings v. Wyman,* 10 *Mass.* 468.

2. That if the statute has altered the common law, it was competent for the legislature to exert all the power implied in its literal interpretation. *Walker v. Bacon,* 8 *Mass.* 468. *Patterson v. Philbrook,* 9 *Mass.* 151. *Trull v. Wilson,* 9 *Mass.* 154. *Bacon v. Callender,* 6 *Mass.* 303.

The cause having been continued to this term for advisement, the opinion of the Court was now delivered as follows, by

MELLEN C. J. The general title of the demandants to what is commonly called the *Plymouth* claim or patent, is not disputed. But it was urged by the counsel for the tenant, that the land demanded in this action, though within fifteen miles of *Kennebec* river, is not within the true bounds of the claim. The deposition of *Ballard* has been relied on to shew what are the utmost limits of *Cobbessecontee ;* and of course what is the true southerly line of the patent. If the line run by him be the true line, it is admitted that the land in dispute lies north of it. The release from the Commonwealth of *Massachusetts,* bearing date *February* 18, 1789, to the company, conforms to this line ; and it has once or twice been decided by the Supreme Judicial Court of that Commonwealth, that this release has settled the question as to the limits of the claim. Besides there is, we may say, an almost universal acquiescence, even among the settlers themselves who are upon the tract, with respect to this point ; and for nearly thirty years past the Courts have considered the question as at rest ; though within that time it has, by a few individuals, been moved and briefly discussed when all other grounds of defence had failed. Without dwelling on this part of the cause, we would observe, that we consider the south line as established, and of course the title of the demandants

to the premises in dispute is a valid one, unless it is defeated, in whole or in part, by the facts and principles which the tenants rely upon in their defence. This defence is grounded on the possession which they, and those under whom they claim, have had of the demanded premises; the west half or part, for more than thirty years next before the commencement of the action, having been completely and constantly occupied and improved and inclosed by fences; and the east half or part having been claimed and possessed by marked trees, and lines, and corner bounds, and the cutting and carrying away of timber and wood, as occasion required, for more than thirty years before the action was commenced; and during that time by payment of taxes on the premises demanded, and exercising an authority over the lands by forbidding persons to cut wood, &c. thereon.

The counsel for the demandants, to this defence, have opposed sundry objections, which may be reduced to two heads.

1. They have contended, that the possession above mentioned has not been of such a nature as to amount to a disseisin of the demandants as to *any part* of the demanded premises.

2. But if they have been disseised of any part for thirty years next before the commencement of this action, it is only of the west half or part; and that as to the residue of the premises they are entitled to judgment, notwithstanding any of the provisions of the *Stat.* 1821. *ch.* 62. *sec.* 6. which have been urged and relied upon by the counsel for the tenants.

As to the *first point.*—By an inspection of the facts reported in this case, it does not appear in *express terms* with what motives *Nathan Longfellow* entered into and occupied the premises, or his son after him, or those to whom his interest was conveyed. It is not stated that the possession was adverse, and under claim of title; nor that it was by the express or implied permission of the proprietors. The intentions then of those, who successively possessed the lands, must be collected from the acts they performed, the language they used, and all the circumstances attending the possession.

The opening counsel for the demandants, with great industry and intelligence, has collected and arranged a long list of authorities; many of which were intended to shew that no pos-

session of the lands of another can amount to a disseisin of the true owner, unless such possession appeared to be under a claim of title, and of course an adverse possession; and unless it was also open, notorious, continued, and exclusive, and the extent of it marked by fences inclosing the lands, and erected for the purpose of protecting them from incursion. We do not deem it necessary for us to bestow particular attention on the numerous cases and books referred to on this head.

The doctrine of the common law on this subject seems to be plain and well settled. A possession must be adverse to the title of the true owner, in order to constitute a disseisin. The possessor must claim to hold and improve the land for his own use and exclusive of others. The cases cited from the *New-York* Reports appear to be in accordance with these principles. It may be more to our present purpose to compare those principles with the law of disseisin, as understood, recognized, and practised upon in *Massachusetts*, prior to our separation from that State, and by this Court since its organization, in those cases which have come before us. We are inclined to believe that upon examination it will be found that the principles of the common law are applied in *England*, and in *New-York*, with more strictness, as it regards the *occupant* of the land, than they have ever been in *Massachusetts*, or with us, upon the doctrine of disseisin, at least so far as relates to the presumption of law in reference to the intentions of the possessor. However this fact may be, so far as we have been able to examine and ascertain, it appears that in the trials which have taken place for a long series of years in the Supreme Judicial Court, before we became an independent State, it was never considered incumbent on the tenant in the case of a count on the demandant's own seisin, to prove any thing more than his continued and exclusive possession and occupancy, for thirty years next before the commencement of the action, using and improving the premises, after the manner of the owner of the fee; such possession, occupancy, and improvement, unless explained, affording satisfactory evidence to the jury that such tenant claimed to hold the lands as his own.

This was the common course of proceeding, and no distinct and additional proof was necessary, in the first instance, to

show that such possession was adverse, and under claim of title; nor necessary in any stage of the cause, unless rendered so by proof offered on the part of the demandants, tending to shew that such possession was never intended to be adverse, but on the contrary in submission to or consistent with the title of the true owner. In *Commonwealth v. Dudley*, 10 *Mass.* 407, *Jackson* J. when speaking of the possession of a third person, which might defeat the operation of the deed of the true owner, says, " the possession is not of itself conclusive " against the effect of the conveyance. It may always be ex- " plained, as by shewing that the occupant was tenant for " years of the grantor, or that he held in any other manner " with knowledge of the grantor's title, and acknowledging its " validity." A vast number of suits, wherein the present demandants were parties, have been tried and decided on these principles. In some cases the presumption of adversary claim has been removed, by proof on the part of the demandants, and, of course, the title by disseisin set up by the tenant has failed; and in all other cases it has succeeded, if open, continued and exclusive. This course has been so long pursued, and such has been the uniform and steady acquiescence in its legality, by successive Judges, lawyers and the community at large, that we do not feel authorized or inclined to change it.

In the case at bar, the tenants have proved their possession of the west half or part of the premises by fences, which have enclosed it for more than thirty years next before the commencement of the action. These fences have been repaired, and renewed by the possessors; a house has been erected on the land; improvements gradually made and extended; corner bounds and lines preserved; the income exclusively enjoyed by the successive occupants; taxes paid by them, and the controling power of a rightful owner constantly and peaceably exercised, during all the above term. This is the usual process of a disseisin, and brings the case within the principles relating to disseisin, as understood, recognised, and in practice in this State. No fact appears, tending in any degree to shew that the possession was under the title of the demandants, and not completely adverse to it. We are therefore of opinion, that the first objection of the demandants' counsel cannot pre-

fail; and that as to the *west half* or part of the premises in question, the tenants have established a good and valid title.

As to the *second point.* The questions which have arisen in our consideration of this part of the cause have presented some doubts and difficulties; and for that reason we have delayed our decision until this time. The merits of the objection we are now examining, and of that part of the defence to which it is opposed, must depend on the construction to be given to the sixth section of the statute of limitations of 1821, *ch.* 62. The demandants' counsel contend that they are not bound in this case, by the provisions of that section; that it is retrospective, unconstitutional, and so far as it respects past transactions and vested rights, is void.

All this is denied by the counsel for the tenants, who considers the section as introducing no new principle; but only as removing doubts, and in clear language expressing what the common law was before, which in some recent decisions appeared to have been mistaken, and rendered in some measure uncertain. Hence it becomes necessary for us to ascertain, in the first instance, what were the true principles of the common law on the subject of disseisin, at the time our statute of limitations was enacted, and then inquire whether those principles have been altered, and if so, to what extent, by the before mentioned section of that statute. We have already stated some of the general principles of the common law respecting disseisins, more particularly with reference to a claim of right on the part of the person in possession, and the nature and presumption of his intentions in holding possession. We would now add that the possession must not only be, in its nature, adverse to the rights of the true owner, but it must be open, notorious, continued, and exclusive. *Atkyns v. Horde,* 1 *Burr.* 60. *Butler's* notes to *Co. Litt.* 380, *b. note* 285. *Smith v. Burtis,* 6 *Johns.* 198. *Brandt v. Ogden,* 1 *Johns.* 158. *Jackson v. Waters,* 12 *Johns.* 368. *Jackson v. Schoonmaker,* 2 *Johns.* 230. But the facts, relied on to prove the possession exclusive, may be different in different cases; and such are not, and cannot be distinctly defined in our law books, when laying down general principles. They must however be such as at once to give notice to all, of the nature and extent of the possessor's improve-

ments and claim; and show the exclusive exercise of domin-
ion over the land, and appropriation of it to his own use and
benefit. It must be such an open and visible occupancy, that
the proprietor may at once be presumed to know the extent of
the claim and usurpation of him who has intruded himself un-
lawfully into his lands, with intent to obtain a title to them by
wrong.

We apprehend that there were several modes of shewing
the exclusiveness of possession, before the statute of limitations
was passed, besides natural boundaries, or surrounding fences.
We are sensible that since the decision of the case of *Ken.
Prop'rs v. Springer*, 4 *Mass.* 416, a different opinion has been
entertained, and a different practice has prevailed in jury
trials in the several Courts before and since our separation.
And no distinction seems to have been generally made in such
trials, between those cases where the person in possession
entered and claimed to hold under a deed duly registered,
(though from a person not owning the estate,) and where he
entered without any such deed, and without any claim or colour
of title. In both cases trials have proceeded on the same
principles; and it has been usual to call on the tenant to prove
that he himself, or he and those under whom he claimed, had
possessed the land within fences for the time by law required
to bar such action. Now we apprehend there is a distinction
between the two cases above mentioned, which has often been
sanctioned by individual Judges of *Massachusetts*, and of this
Court; and in some reported cases decided by the Supreme
Judicial Court of that State, it seems to have been expressly
recognized as law. This distinction, when examined, may
serve to aid us in giving a construction to the section in ques-
tion, and render the case of *Ken. Prop'rs v. Springer* liable to
no objection.

It seems to us, that the principles of that decision have not
been understood exactly as was intended by the learned and
distinguished Judge, who pronounced the opinion. By a care-
ful examination of that case, it does not appear, in any part of
it, that the Court expressly decided, that a surrounding fence
for thirty years was necessary to constitute a disseisin, even
when the occupant entered *without* any claim of title under a

deed. It is true it appeared in that case that the land demand-
ed had not been fenced for thirty years. It had only been
run round and its lines marked by a surveyor at the request of
the tenant's father. The Chief Justice says, "There is no
" evidence that he (the father) ever fenced any part of the
" land, till the year 1792, which is within thirty years, or ex-
" ercised any act of ownership on it, except that he some
" times cut the grass on a small meadow which was part of it.
" The running round the land by a surveyor, and marking the
" lines by the direction of one *who claims no title in the land*, is
" not such an exclusive occupation of the land as can amount
" to a disseisin of the demandants; neither can the cutting
" grass on the meadow by *Springer*, who does not appear to
" have claimed the land, amount to a disseisin. To constitute
" a disseisin of the owner of uncultivated lands, by *an entry*
" *and occupation* of a party not claiming title to the land, the
" occupation must be of *that nature and notoriety*, that the owner
" may be presumed to know that there is possession of the
" land adverse to his title." But this does not prove that noth-
ing except a natural boundary or a surrounding fence would
in any case constitute a disseisin. It rather seems to show that
it is *one mode* of proof, and in *some cases* it may be the only one.
If we are correct as to the import and extent of the above
cited decision, it will not be found to have established any prin-
ciple variant from the former part of the section, as hereafter ex-
plained and construed, We shall notice this more particularly,
when we examine the different parts and provisions of the section.

We now proceed to notice the distinction which we
have before alluded to, between an entry upon, and a
possession of another's land, *without a claim of right under a
recorded deed*, or other matter of record; and an entry upon
and a possession of such lands, *under such a claim* and such a
deed or matter of record. The case of *Ken. Prop'rs v. Springer*
expressly recognizes and establishes this distinction. *Parsons
C. J.* in delivering the opinion of the Court, says, "When a
" man enters on land, claiming a right and title to the same,
" and acquires a seisin by his entry, his seisin shall extend to
" the whole parcel; for in this case, an entry on part is an
" entry on the whole. When a man not claiming any right or

" title to the land, shall enter on it, he acquires no seisin but
" by the ouster of him who was seised; and to constitute an
" ouster of him who was seised, the disseisor must have the
" actual exclusive occupation of the land, claiming to hold it
" against him who was seised; or he must actually turn him
" out. When a disseisor claims to be seised by his entry and
" occupation, his seisin cannot extend further than his actual
" and exclusive occupation." It is evident from the whole
case, that when the Chief Justice is speaking of an entry of a
person claiming title, he means claiming it under a deed of
conveyance, or some other matter of record. Perhaps it may
be said that when speaking of such claim of title, he means a
good right and title against all others; but in the case of
*Higbee & al. v. Rice,* 5 *Mass.* 344. the same Chief Justice in
pronouncing the opinion of the Court, says, " A conveyance
" by deed duly acknowledged and registered, is, by our statute
" of enrolment, equivalent to livery and seisin. Under this
" deed the tenant entered into the whole, and acquired a free-
" hold estate either by right or by wrong. If by wrong, as
" appears in this case, it was an actual disseisin." See also
*Jackson v. Elston,* 12 *Johns.* 454.

From these two cases then it appears that if a man enters
upon a tract of land under a deed duly registered, though from
one having no legal title to the land, and has a visible posses-
sion, occupancy and improvement of only a part of it, *such
occupation and improvement,* unless controled by other facts,
being continued thirty years, is a disseisin of the true owner
of the *whole tract;* and the reason is, the *extent and nature* of
his claim are or may be known by inspection of the public
registry. His deed being registered there gives notoriety to
his act and his motives, respecting the lands he occupies. To
this point see also the case *Little v. Megquier,* [*ante, page* 176.]

Having thus taken a view of the principles of the common
law respecting the doctrine of disseisin, as existing and applied
in this State at the time the statute of limitations was enacted,
we now proceed to a more particular examination of the sixth
section of the act. The section is in these words: viz..

" Be it further enacted, that in any writ or action which *has
" been* or may be hereafter brought, for the recovery of any

" lands, tenements or hereditaments, it shall not be necessary
" for limiting the demandant and barring his right of recovery,
" that the premises defended shall have been surrounded by
" fences, or rendered inaccessible by other obstructions, but it
" shall be sufficient if the possession, occupancy and improve-
" ment thereof by the defendant, or those under whom he
" claims, shall have been open, notorious, and exclusive ; com-
" porting with the ordinary management of similar estates in
" the possession and occupancy of those who have title there-
" unto, or satisfactorily indicative of such exercise of owner-
" ship as is usual in the improvement of a farm by its owner ;
" and no part of the premises demanded and defended shall
" be excluded from the operation of the aforesaid limitation,
" because such part may be woodland or without cultivation."

The inquiry now is, whether the above quoted section has
introduced any new principles of law, by altering the common
law, as to the doctrine of disseisin. If the section had been
concluded with the words " *shall have been open, notorious and
exclusive,*" we apprehend that upon the common law construc-
tion of those terms, it would not be considered as having es-
tablished any new principle. This we have intimated before ;
but the descriptive words which follow immediately and com-
plete the sentence, were evidently intended to explain, qualify
and restrain the *generality* of the terms " open, notorious and
exclusive," and thereby change their meaning ; otherwise they
must have been used without any intention ; and this we are
not to presume. The only sensible, fair, and rational construc-
tion of the whole sentence is this ; that it shall be sufficient if
the possession of the defendant shall have been *as* " open, no-
torious and exclusive" as is usual in the case of the ordinary
management " of similar estates *in the possession and occupancy
of those who have title thereunto.*" The concluding sentence of
the section is in unison with this idea, and a distinct affirmation
of it. In a word, the whole section, taken together, appears to
have been enacted with a view, and for the purpose of abol-
ishing the distinction, well known to have then existed between a
possession *under a claim of title on record,* and a possession
without any such claim or pretence of title. For by law, as
well known and understood, there was no such thing as a *con-*

*structive possession* in favour of a person entering and claiming to hold by disseisin merely, without title or colour of title. The object of the section was to authorize and require a constructive possession in *both cases ;* and to attach to it the *same.* legal consequences in respect to the rights of the demandant.

If the section had been in its terms *prospective only,* or been so worded as to admit of our giving it such a construction, on the ground that such was the intention of the legislature, no objection would exist against their authority to enact it; nor would there be any inconveniences in giving it the intended operation. Nor is there now any objection to the provisions of the section, so far as they may apply to and govern facts, which have taken place since the act was passed, or may take place in future. Whether the section, or any part of it, be liable to the objections, which have been urged against it by the counsel for the demandants, as being *retrospective* and *unconstitutional,* is a question which remains to be considered.

The section is certainly retrospective as well as prospective. It professes to establish principles by which causes, then pending, as well as those which might in future be commenced, should be decided. It professes to operate on *past* transactions, and to give to facts a character which they did not possess at the time they took place ; and to declare that in the trial of causes *depending on such facts,* they shall be considered and allowed to operate in the decision of such causes, according to their *new character.* It professes to settle rights and titles depending on laws as they existed for a long series of years *before* the act was passed, by new principles which, for the first time, are introduced by its provisions. It professes to change the nature of a disseisin, and of those acts which constitute a disseisin, and thereby subject the true owner of lands to the loss of them, by converting into a disseisin, by *mere legislation,* those acts which, at the time the law was passed, did not amount to a disseisin. It professes to punish the rightful owner of lands, by barring him of his right to recover the possession of them, when, by the existing laws, he was not barred, nor liable to the imputation of any *laches* for not sooner ejecting the wrongful possessor.——It is true that there is no *express* provision in our constitution, as there is in that of *New-Hampshire,*

by which the legislature are prohibited from enacting retro-spective laws ; though upon examination, we apprehend it will be found to contain certain provisions which were intended to be, and must be considered, as prohibitions. These will pres-ently be noticed. In the case of *Fletcher v. Peck,* 6 *Cranch.* 87. *C. J. Marshall,* in pronouncing the opinion of the Court, says, " It may well be doubted whether the nature of society and of " government does not prescribe some limits to the legislative " power ; and if any be prescribed, where are they to be found, " if the property of an individual, fairly and honestly acquired, " may be seized without compensation." When speaking of the act of *Georgia,* he observes, " *the validity of this rescind-* " *ing act, then might well be doubted, were Georgia a single sovereign* "*power.* But she is a part of a large empire. She is a mem- " ber of the *American* Union ; and that Union has a constitution " which declares that no State shall pass a law impairing the " obligation of contracts." He afterwards adds, " The estate " having passed into the hands of a purchaser for a valuable " consideration, without notice, the State of *Georgia* was re- " strained, *either by general principles which are common to* ALL *our* " *free institutions,* or by the particular provisions of the constitu- " tion of the United States." In the case of *Society, &c. v. Wheeler,* 2 *Gal.* 105, *Story J.* in delivering his opinion says,—" Upon " principle, every statute which takes away, or impairs, vested " rights, acquired under existing laws, or creates a new obliga- " tion, imposes a new duty, or attaches a new disability in re- " spect to transactions or considerations already past, must be " deemed retrospective ; and this doctrine seems fully support- " ed by authorities." He cites *Calder v. Bull,* 3 *Dall.* 386, and *Dash v. Van Kleek,* 7 *Johns.* 477, and then adds,—" The " reasoning in these authorities, as to the nature, effect and in- " justice in general of retrospective laws, is exceedingly able " and cogent ; and in a fit case, *depending on elementary princi-* " *ples,* I should be disposed to go a great way with the learned " argument of Chief Justice *Kent.*" It was not necessary in that case to decide on elementary principles, in consequence of the provision in the constitution of *New-Hampshire* respecting *retrospective* laws, to which we have before alluded. We will not cite passages from the opinion of the Court in *Dash v.*

*Van Kleek.* The whole case is full of learning upon the subject now under consideration. See also *King v. Dedham Bank,* 15 *Mass.* 447. *Medford v. Learned,* 16 *Mass.* 215. *Foster v. Essex Bank, id.* 245.

The provisions in our constitution relating to this subject are the following.

The *first* is contained in the first article of our declaration of rights and the first section.—This section, among other things, secured to each citizen the right of " *acquiring, possessing, and* " *protecting* property, and pursuing and obtaining safety and " happiness." By the spirit and true intent and meaning of this section, every citizen has the right of "possessing and pro- " tecting property" according to the *standing laws* of the state in force *at the time of his* " *acquiring it,* and *during the time* of his continuing to possess it. Unless *this* be the true construction, the section seems to secure no other right to the citizen, than that of being governed and protected in his person and property by the laws of the land, for the time being. Such a provision for such a purpose merely, would not have been introduced, even by jealousy itself. The design of the framers of our constitution, it would seem was, by the part of the section above quoted, to guard against the retroactive effect of legislation upon the property of the citizens. This construction is strongly corroborated by the language of the constitution of this State, article 4, part 3, sect. 1, defining the powers delegated to the legislature ; viz :—" The legislature shall have full " power to make and establish all *reasonable* laws and regula- " tions, for the defence and benefit of the people of this State, " not repugnant to this constitution, nor to that of the United " States."

The twenty-first section of the article first quoted is in these words ;—" Private property shall not be taken for *public uses,* " without just compensation ; nor unless the public exigences " require it." This article was designed to guard private property from the operation of laws merely prospective, in all cases except of public exigency ;—and even then the individual is not to be injured by the ademption of his property ; he is to receive " just compensation."—But the *private* property of one man cannot be taken for the *private uses* of *another* in any case.

It cannot by a *mere act of the legislature* be taken from *one man,* and vested in *another directly ;* nor can it, by the *retrospective operation* of laws be indirectly transferred from one to another; or subjected to the government of principles in a Court of Justice, which must necessarily produce that effect.

In order to shew the importance and correctness of the principles which we have stated, and to render them still more plain, one or two illustrations may be useful.

According to the law now in force in this State, revised in 1821, no devise of real estate is valid, unless the will is attested by *three* or more witnesses.—Let us suppose a will made on the first of *January* 1822, and attested by only *two* witnesses.—Should the devisee of a tract of land, thus devised, enter into possession, and hold it against the heir at law, such heir could maintain his writ of entry against the devisee; and the will, thus imperfectly executed, could furnish him with no legal defence in the action.—But let us suppose further, that at the next session of our legislature, they should pass a law declaring that, '' in any action then pending, or which might be '' brought, it should not be necessary in any such action, '' brought by an *heir* against a *devisee,* claiming the premises '' demanded, under the will of the ancestor, for the defendant '' to prove that the said will was attested by *three* or more wit '' nesses ; but that it should be sufficient to bar such action, if '' on trial it should appear that said will was attested by two '' *witnesses only.*''

Now if after the passage of such a law, the heir, in the case supposed, should bring his action against the devisee to recover seisin and possession, can any Judge or any man in the exercise of a sound understanding for a moment believe that such a law could create and furnish to the tenants a substantial defence in the action ? The question admits of only one answer.

According to existing laws, deeds of conveyance of real estate must be *under seal.* Such deeds, to pass a *fee-simple estate,* must contain certain legal terms ; viz.—the conveyance must be to the grantee and his *heirs.* To entitle a widow to dower in her deceased husband's estate, he must have been seised of it *during the coverture.* Now if our legislature should at the next session pass a law declaring that all deeds of conveyance

of real estate, that had *before that time* been executed, or should in future be executed, should be considered and adjudged sufficient in law to pass the estate therein described, in fee simple, though such deeds were not under seal, and contained no words of inheritance ;—and that a widow should in all cases be entitled to dower in her deceased husband's estate where he had died, or might in future die, seised of such estate at any time *before* as well as *during* the coverture ;—will the principles on which a free government is founded,—will the principles of common honesty and justice, sanction such a law, so far as to give it a *retroactive* effect, and thereby disturb, impair and destroy the vested rights of those, who had become the owners of the estates under *then* existing laws ? There is yet another point of view in which the subject may be placed, well adapted to shew the character of the provisions of the section in question, and the danger of giving legal effect to them in the manner contended for by the counsel for the tenants. According to the well established principles of the common law, as we have before observed, no man or corporation can maintain a writ of entry against any person who, for thirty years, has had the *open, notorious, adverse and exclusive* possession of lands belonging to such man or corporation. Against such a claim, such possession is a good and sufficient title in law. Would it be in the power of the legislature to divest and destroy such a title by a mere act of retrospective legislation ;—and by declaring that such a possession and disseisin should avail nothing in an action brought to recover possession of such lands ? The mere statement of the case shews that a law of the description above mentioned would, if it could produce the intended effect, violate the plainest principles of law and justice.—To illustrate the case and bring it home to the understanding of all, let us suppose that the tenant in this action, and those under whom he claims, at the time it was commenced, had been in the open, adverse and exclusive possession of the demanded premises for *thirty* years, and during all that time had maintained surrounding fences. Let us further suppose that the action had not yet been tried, but was to be tried at this term. Let us further suppose that the legislature, at their last session, had passed a law declaring that in all actions, *then pending or that*

Prop'rs Ken. Purchase *v.* Laboree & als.

*might be commenced after the passing of such act,* no adverse, no-torious and exclusive possession of the demanded premises, although surrounded with fences, should be a bar and constitute a good defence in such action; unless such possession and disseisin has, or shall have been continued for *forty* years, next before the commencement of such action.—Now would the tenant or any other man, understanding and respecting principles, consider such a law constitutional? On the contrary, would it not be at once pronounced unjust and void? If such an act of the legislature could be sanctioned, not only the tenant, in the circumstances we have supposed, would be deprived of his estate by a destruction of vested rights, but a large class of citizens, similarly situated, would suffer under similar deprivations. *The more the principle of the section in question is examined, the more distinct becomes its objectionable features.*

We have thus far considered the section in question rather in the light of a law defining and settling the rights of parties in real actions, and establishing certain principles to be observed in their decisions by Courts and juries. We now proceed to consider it as a part of a statute of limitations, and examine its character and merits in that point of view. The authority of the legislature to pass statutes of limitations, in the form in which they are usually enacted, will not be denied. Such statutes have been considered salutary in their consequences. With respect to *personal* actions, they serve to render people attentive to the early adjustment of demands, and prevent the disturbance of settlements which have been made, but of which the proof may have been lost. But in all such cases, the legislature have allowed a certain time *after* the passage of the law, and before its operation should commence, within which, creditors might institute legal process for the recovery of the debts due them, if they should incline so to do. And it is very clear that if no such interval is allowed, but the act is permitted to take effect *instanter,* thereby depriving creditors at once of all legal remedy for the recovery of those demands which it purports to bar,—it unquestionably violates the constitution, by " impairing the obligation of contracts ;"—and the Courts of law would be bound to consider it as void. The limitation of *real* actions is equally salutary ; and the community has doubt-

less derived much advantage from those laws which have grad-
ually reduced the time, after which the owners should be barred
of their actions.   But all such laws have allowed a reasonable
time within which they might prosecute their claims and make
their entries.—A sense of right and justice seems to have dic-
tated this provision ; and all the reasoning, founded on *moral
principle,* is applicable with the same force to the limitation of
real, as personal actions.   In *Call v. Hagger & al.,* 8 *Mass.* 423,
an act of limitation was objected to, as being unconstitutional.
The Court observe,—" To extend this principle to acts for the
" limitations of suits at law, which, when enacted with discre-
" tion, *and a reasonable time allowed for the commencement of suits
" on existing demands,* are wholesome and useful regulations,
" would be extravagant."   But in that case the Court did not
allow the limitation to extend to actions on bonds, where the
escape had taken place·before the passing the act, and a right
of action had vested in the creditor.—*Story J.* in the before-
mentioned case of *Society, &c. v. Wheeler,* says,—" If the legis-
" lature were to pass an act of limitations, by which all actions
" upon *past disseisins* were to be barred, without any allowance
" of time for the commencement thereof *in futuro,* it would be
" difficult to support its constitutionality, for it would be com-
" pletely retrospective in its operation on vested rights."   In
the case of *Sturgis v. Crowninshield,* 4 *Wheat.* 122, *Marshall C.
J.* says,—" If in a State where six years may be pleaded in
" bar to an action of *assumpsit,* a law should pass, declaring
" that contracts *already in existence, not barred* by the statute,
" should be *construed* to be within it, there could be little
" doubt of its unconstitutionality.   So if a law should declare
" that contracts entered into, and reserving *legal* interest,
" should be *usurious and void,* either in whole or in part, it
" would impair the obligation of the contract, and would be
" clearly unconstitutional."   Without adducing any more au-
thorities to this particular point, we would observe, that many
of the cases and much of the reasoning, which we have applied
to the section in question under the other view of it, are appli-
cable to it as an act of limitation. .

The result of this investigation then is, that the section of
the statute under review, so far as it is *prospective,* is liable to no

objection; but so far as it is *retrospective,* and has *altered the common law,* it is *unconstitutional,* and cannot be carried into effect; because *such* operation would impair and destroy *vested rights,* and deprive the owners of real estate of their titles thereto, by changing the principles and the nature of those facts, by means of which those titles had existed and been preserved to them in safety. We have before stated wherein the common law is changed by the provisions of the section in question, viz., the well known distinction between a possession of lands under a *claim of title on record,* and a possession *without any such claim* is abolished; and Courts of law are authorized and required to extend to possessors in *both cases,* and in the same manner, the benefits of *constructive possession,* and attach to it the same legal consequences as to all concerned.

Let us now apply the principles, thus ascertained and established, to the present case.

It appears that the tenants have no title except what they have derived from *Nathan Longfellow,* who entered *without any pretence of right,* as a mere possessor and wrong doer. In the year 1794, twenty-four years before the commencement of this action, *Longfellow* released all his right to the premises, on which he had entered, to his son *Jacob,* under whom the tenants claim by regular conveyances. It does not appear that the deed of release, or any of the subsequent conveyances, were ever registered. It is stated that the *easterly half or part* of the demanded premises, the part now in question, has *never been improved or cleared.* It is true, it appears by the report *that it was known* that there were marked trees at the northeast and southeast corners of the lot demanded, which *Longfellow* claimed as the corners of his lot. And for more than thirty years before the commencement of this action there were marked trees on the lines running from the corners to the river, which he claimed as the lines of his lot, and also across the head thereof;—that *Longfellow* cut and took away timber and wood on the back end, and any part of the lot, as he had occasion, and forbid others from lumbering and cutting on the lot; and paid all the taxes assessed on *the lot;* and that the said lines were openly known and recognized as the bounds of *Longfellow's* lot, during said thirty years. Do these facts

amount to a disseisin of the demandants as to said *easterly half* of the lot ?

With respect to the taxes, it may be observed, that as the west end of the lot was in *actual possession,* and under *actual improvement,* the assessors were by law bound to assess *Longfellow,* and we must presume that they assessed him for his visible improvements.   At best, however, such proof in general is of little importance, as of itself it proves no disseisin.   *Longfellow* would have been assessed in the same manner, had he been a tenant of the demandants.   It does not shew a possession to be adversary or exclusive.   What facts are there in the case shewing the possession to be *exclusive ?*   The lines and bounds were claimed by *Longfellow* to be his; and *this fact* was openly known.   He also cut wood and timber on any part of the lot, as he had occasion; and so in the case of *Ken. Prop'rs v. Springer,* the tenant's father cut the grass on a meadow, a part of the premises demanded; in that case the lands had been surveyed and the bounds marked by spotted trees. Indeed the *facts* in that case are nearly the same as in the present, excepting that there, no part of the demanded premises had been enclosed by fences for thirty years; in the case before us, a part has been, and the title of the tenants in such part is secured to them as we have already decided.   As we understand and have explained the case of *Prop'rs v. Springer,* it has not established, nor was it intended to establish any new principle.   The objection of the tenant's counsel has been urged against that decision, on the ground that it *had* introduced and established a new principle.   We consider that case as a strong authority in this, in favour of the demandants; marking clearly the distinctions to be observed between *different kinds of possession,* as under claim of *title on record,* and *mere naked possessions.*   In the case before us, there is no proof of any fence, or natural obstruction to guard the *easterly half* of the lot from incursion ; no actual improvement and cultivation, notoriously marking the bounds of the tenant's claim, and excluding all others ; no registered title or claim of title, shewing the extent of such claim, or the grounds on which it is placed, and operating as the *assertion of right* in opposition to all others ; nor any thing but surveys, and lines, and corner

bounds; with the exception of those acts of cutting timber and wood, which might be proved in the case of common trespasses. The before cited case of *Jackson v. Schoonmaker*, 2 *Johns.* 230. is equally in point against the tenants, upon the evidence before us. It is there decided that even a possession fence, made by felling trees and lapping them one upon another around the lot, will not suffice to make out an adverse possession, when that is the only defence; but that there must be a substantial enclosure and real occupancy; a *pedis possessio, definite, positive, and notorious*, to countervail a legal title. This case carries the principle farther than that of *Ken. Prop'rs v. Springer.*

Upon principle and authority, we are therefore of opinion, that, in regard to the *easterly half* or part of the demanded premises, the instructions of the Judge to the jury were incorrect, and of consequence, that the verdict must be set aside, and a new trial granted.

We are aware that the opinion we have now delivered has been extended to an unusual length; but being aware also that it is a cause of much expectation, the decision of which involves a constitutional question, and may be extensive in its influence in other cases, and to a wide extent; we have bestowed much attention in the examination of principles, and cautiously arrived at the result. It is always an unpleasant task for a judicial tribunal to pronounce an act of the legislature in part or in whole unconstitutional. We agree with the Supreme Court of the United States, in the case of *Fletcher v. Peck,* that "the "question whether a law be void for its repugnance to the con- "stitution is, at all times, a question of much delicacy, which "ought seldom, if ever, to be decided in the affirmative, in a "doubtful case. But the Court, when impelled by duty to "render such a judgment, would be unworthy of its station, "could it be unmindful of the obligation which that station im- "poses."

We cannot presume that the legislature, which enacted the law, considered the section in question, as violating any constitutional principle, or in any manner transcending their powers. Be that as it may, the oath of office, under which we conscientiously endeavour to perform our duties, imposes upon us as solemn an obligation to declare an act of our legislature *un-*

*constitutional,* when, upon mature deliberation, we believe it to be so ; as it does to give prompt and full effect to all *constitutional* laws, in the administration of justice.

*Verdict set aside and a new trial granted.*