OTSEGO SPECIAL TERM, January, 1849, *Mason*, Justice.

## WHITE *vs.* WHITE.

The act of April 7th, 1848, for the more effectual protection of the property of married women, so far as it relates to existing rights of property, in married persons, is unconstitutional and void.

The legislature of the state of New-York can lawfully exercise only such powers as have been confided to it by the sovereign will of the people. *Per* MASON. J.

The people have never delegated to the legislature the power to divest the vested rights of property legally acquired by any citizen of the state, and transfer them to another, against the will of the owner. *Per* MASON, J

THIS was a complaint filed by the plaintiff, who is the wife of the defendant, against her husband, to protect what she claims to be her rights in relation to her real estate, and to restrain the defendant from interfering with the same. The complaint stated that the plaintiff, as the heir at law of Richard Cary, succeeded to certain real estate as tenant in common with seven other of the children of the said Richard Cary; and that the plaintiff married the defendant in 1819, and that there were six children still living, the issue of such marriage. That proceedings in chancery were taken to make partition of the lands among the children of the said Richard Cary, and that such proceedings were had, that on the 23d day of July, 1828, commissioners to make partition were appointed, who assigned and allotted to the plaintiff, as one of the heirs at law of the said Richard Cary, in the names of herself and the said defendant her husband, a certain farm of land known as lot No. 6 containing 100 acres situated in the town of Springfield in the county of Otsego, and also several other farms in said tract, amounting in the aggregate to 470 acres, or thereabouts. That said commissioners made their report of partition and the same was confirmed by the court on the 5th day of December, 1828, and a final decree of partition made, and that the plaintiff took possession of said lot No. 6 so assigned to her, and from that time had continued to reside on and occupy said lot until within the last few weeks, during which time the

White *v.* White.

plaintiff had been prevented from occupying the premises, and living in the dwelling house, by the defendant. The complaint set forth also that since the said partition the defendant had had the management and control of the property, and enjoyed the receipts, and rents, issues and profits of the same; that the defendant was a man of idle habits and addicted to the use of spirituous liquors, to such a degree as to become frequently intoxicated ; that he had been careless and improvident in the management and cultivation of the said farm and had greatly neglected the same; and that since the passage by the legislature of this state of the law for the more effectual protection of the property of married women the defendant had avowed to the plaintiff his determination to exercise the exclusive control and direction of the said farm, and had prevented the plaintiff from having any power or control over the same; stating attempts by her to use and control the property, and the prevention thereof by the defendant, and finally the entire expulsion of her from the house and premises, and this by personal force and violence, and the refusal of the defendant to permit her to return, and live in the house, or upon the premises, and an entire omission and refusal of the defendant to provide for her or her family, and an increase of the intemperate habits of the defendant; concluding with a prayer for the relief above stated. To this complaint the defendant interposed a demurrer, alleging as the grounds of demurrer, 1. That the court had no jurisdiction of the action, and no power to grant the relief; 2. That the complaint did not state facts sufficient to constitute a cause of action, inasmuch as it appeared from the complaint, that the rights of the defendant to the property in question were vested rights, and claiming that the act of April 7th, 1848, enacted for the protection of the property of married women, could not apply to the case.

*R. Cooper*, for the plaintiff.

*Starkweather & Field*, for the defendant.

MASON, J. The second section of the act of April 7th, 1848, under which the plaintiff claims the possession of the property in this case and that the defendant be restrained from interfering with the same, &c. is as follows: " The real and personal property, and the rents, issues and profits thereof, of any female now married, shall not be subject to the disposal of her husband, but shall be her sole and separate property, as if she were a single female, except so far as the same may be liable for the debts of her husband heretofore contracted." (*Laws of* 1848, *p.* 307.) It is a general rule that courts incline against such a construction of a statute as would give it a retrospective action, so as to take away a vested right. (7 *John. Rep.* 477.) But when the intention of the legislature is apparent, it is the duty of the courts to see that the statute has its full effect, and is not eluded by construction. (15 *Id.* 358.) I do not for a moment doubt that it was the intention of the legislature, by this statute, to give to the wife control over her real estate, and to sever the husband's rights to possess it. This, it seems to me, is most manifest from the plain reading of the statute itself. The husband, by the marriage, does not become absolute proprietor of the wife's inheritance, but, as governor of the family, is so far master of it as to receive the profits of it during her life, but has no power to make an absolute sale of it without her consent. (2 *Bacon's Abr. Bouv. ed. tit. Baron & Feme, C. p.* 15.) This is an estate growing out of the marital relations, and is wholly dependant upon them. In the language of the common law, the husband becomes a tenant by the curtesy; the title in fee remaining in the wife. This is one of the legal effects which the common law attaches to the marriage. The wife's legal existence and authority is in a degree lost or suspended, and the husband succeeds to the possession of her lands, and takes the rents and profits *jure uxoris*, and if the wife dies before the husband, without having issue of the marriage born alive, her heirs succeed to the estate. If, however, there has been a child of the marriage born alive, the husband takes the estate absolutely for life as tenant by the curtesy. (2 *Kent's Com.* 3d ed. 130, 131,)

The only difficulty which I have encountered in this case, in giving the plaintiff the relief sought by the complaint, arises from the doubts which have arisen in my mind as to the validity of the statute under consideration.    There have been three considerations urged against the validity of this statute, and which we cannot avoid considering in this case, however grave or delicate the questions may be.    And it would be but arrogance in me did I not feel and confess my embarrassment in the determination of questions of so grave magnitude.    The determination of the questions raised by the demurrer in this case is a duty, however, from which we cannot be excused, however unpleasant the performance of it may be.    The validity of this act of the legislature must be faithfully examined and impartially determined.    The first objection raised against the validity of this statute is that the legislature of this state has transcended its authority as a state legislature.    In short, that the 2d section of the statute under consideration is in conflict with the constitution of the United States, and consequently void.    That it is a statute repugnant to that provision of the constitution of the United States which prohibits a state from passing any law impairing the obligation of contracts.    The argument is that the relation of husband and wife is created by a contract of the parties, and is to be regarded as a mere civil contract between the parties.    That by virtue of the contract of marriage between the parties in this case the husband succeeded to all the plaintiff's personal property and to the rents and profits of her real estate, during coverture at least, and that the statute under consideration takes away from the defendant in this suit those vested rights of property, and thereby assails and impairs the obligations of the marriage contract. This question has never arisen in the courts of this state, and I am not aware of any adjudication of the question in any of the other states of the Union.    I have looked carefully, also, into the reports of the adjudications of the United States courts, and do not find any determination of the question by those tribunals.    I am aware that in the case of *Dartmouth College* v. *Woodward,* (4 *U. S. Cond. Rep.* 576, 7,) the late lamented Jus-

tice Story intimates the opinion that the contract of marriage is a contract, within this prohibition of the constitution of the United States. To use his own language in that case, "If under the faith of existing laws a contract of marriage be duly solemnized, or a marriage settlement be made, (and a marriage is always in law a valuable consideration for a contract,) it is not easy to perceive why a dissolution of its obligations without any default or assent of the parties may not as well fall within this prohibition as any other contract for a valuable consideration." Again he says, "A man has just as good a right to his wife as to the property acquired under a marriage contract. He has a legal right to her society and her fortune, and to divest such right without his default and against his will, would be as flagrant a violation of the principles of justice as the confiscation of his own estate." He concludes, however, by saying, "I leave this case however to be settled when it shall arise." (4 *U. S. Cond. Rep.* 577.) This language is *obiter,* and has not therefore the weight of authority, however we might respect it as the opinion of a learned judge. I have bestowed the most deliberate consideration upon this branch of the case, and have come to a conclusion adverse to that intimated by the learned judge in the case above cited. At the time of the adoption of the constitution of the United States the power of the state legislatures to control and modify the marriage relation, with all its incidents, was unquestioned, and the subject was considered peculiarly within the province of state legislation. And I cannot think that it was against any abuses of the exercise of this right by the state legislatures that this constitutional provision was framed; and that it would therefore be a violent presumption to suppose that it was the intention of the framers of the national constitution to divest the states of their right to legislate upon this subject. And I apprehend that this is the first attempt that has seriously been made to bring the relation of husband and wife within the prohibition of this clause of the constitution respecting contracts; while it cannot be denied, on the other hand, that all the obligations growing out of this relation have, in repeated instances, been wholly annulled by

White *v.* White.

special laws passed by the legislatures of the different states granting divorces to the parties. In many of the states of the Union there is no judicial remedy by one party against the other for a breach of the obligation of the marriage relation; the only remedy being by divorce, which is granted by the legis- lature alone. And I am not aware that the legislative power of a state, thus wholly to annul the marriage relation, has ever been seriously questioned. It is a power that has been exer- cised by most if not all of the states of the Union, and it was adjudged in the case of *Starr* v. *Pease*, (8 *Cowen*, 541,) that a legislative divorce *a vinculo*, for cause, such as a breach of th marriage obligations, was a constitutional and valid act; and such is the opinion of Chancellor Kent in his Commentaries. (2 *Kent's Com.* 107, 3d *ed.*) And the opinion of Chief Justice Marshall in the case of *Dartmouth College* v. *Woodward* is to the effect that a general law regulating divorces for cause is within the province of state legislation; and such indeed is the opinion of Justice Story. He says in that case, that a general law regulating divorces is not necessarily a law impairing the obligation of such a contract. And he is of opinion that a law punishing a breach of a contract, by imposing a forfeiture of the rights acquired under it, or dissolving it because the mu- tual obligations were no longer observed, was not a law impair- ing the obligation of contracts; while at the same time he most emphatically declared that he was not prepared to admit a power in the state legislatures to dissolve a marriage contract at pleasure, without any cause or default, and against the wishes of a party, and without a judicial inquiry to ascertain the breach of the contract.

It cannot be denied that, while the marriage relation is said to be a civil contract between the parties, it is not a contract in the full common law sense of the term. It is from the Romans, from whom we have derived the civil law, that the idea has come that marriage was a civil contract. It was however with them a contract without much of an obligation; as the contin- uance of the relation depended almost wholly upon the caprice of one or the other of the parties. (2 *Kent's Com.* 85, 2d *ed.*

White *v.* White.

*Notes to Cooper's Justinian*, 437, 438.) Marriage is a civil institution, established for great public objects. It is defined to be a compact between a man and woman for the procreation and education of children. (6 *Bac. Abr. Bouv. ed. tit. Baron and Feme, A. Id. tit. Marriage and Divorce, A.*) And it has a similar definition to this in the civil law. (*Cooper's Justinian*, 419.) It is wanting, however, in many of the essential ingredients of a contract, and is regulated more upon grounds of public policy to accomplish the great objects of such a relation, than it is with reference to the pecuniary rights of the parties as it regards each other. Unlike other contracts at the common law, the parties may enter into it, the male at the age of fourteen and the female at the age of twelve years. It cannot, like ordinary contracts, be dissolved by mutual agreement, or cancelled upon a valuable consideration paid. Neither can its obligations be modified by the parties. The will of society, and public policy, supersede the will of the parties. And however unable one of the parties may subsequently become to perform the obligations resulting from the relation, the other is still bound. Not even a total overthrow of all the mental powers, terminating in fixed and permanent insanity, is permitted to operate as a discharge of the other party from its obligations. And the very creation of this relation, with a qualified exception, dissolves all previous contracts between the parties, and produces a total incapacity to enter into any other. In fact, about the only essential features of a contract it possesses is that the assent of the parties is necessary to create the relation; and it cannot be alleged that the mere consent of the parties to establish a certain relation in society between them necessarily makes the transaction a contract. If this were so, the relation of guardian and ward, whenever the ward chooses the guardian, would be the result of a contract, and consequently beyond the control of state legislation. Without further consideration of this branch of the case, I will conclude by saying that in my opinion the marriage relation is not created by what we understand to be a contract in the strict common law sense of that term; and indeed is not what in popular language and com-

White *v.* White.

mon parlance we understand by the term contract; and that it is not therefore a contract within the spirit and meaning of this prohibitory clause of the constitution of the United States. It follows, therefore, that there is nothing in the constitution of the United States which invalidates the statute under consideration; for there is nothing in that instrument which prohibits a state legislature from taking away vested rights, unless they arise out of a contract. This was expressly adjudged in the case of *Watson* v. *Mercer*, (8 *Peters*, 88.)

The next question which I propose to consider in this case is, does the statute under consideration violate the first section of article one of the constitution of this state, which is as follows : "No member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers." The defendant in this suit, by virtue of the marriage contract with the plaintiff, became seised of a freehold estate in this farm. He not only succeeded to rights of property, but he became actually seised of the freehold *jure uxoris*, and entitled to take the rents and profits during their joint lives in any event; and as there were children born alive of the marriage, he took an absolute freehold estate for life as tenant by the curtesy. (2 *Kent's Com.* 130, 1, 2d ed. *Adair* v. *Scott*, 3 *Hill*, 182.) This section one of article one of the present constitution is but a copy of section one of article seven of the former constitution of the state, and has received judicial construction. The question arose in the case of *Taylor* v. *Porter & Ford*, (4 *Hill*, 140,) as to the validity of a general statute of the state authorizing private roads to be laid out over the lands of others, for the use of the *applicant, his heirs and assigns.* And the act of the legislature was adjudged to be unconstitutional, as coming in conflict with this section of the constitution. We must therefore regard this section of the constitution as having received judicial construction. "No member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." The court, in the case of *Tay-*

*lor* v. *Porter and Ford,* in considering the expression "*by the law of the land,*" contained in this section, use the following language : " The words ' by the law of the land,' as here used, do not mean a statute passed for the purpose of working the wrong. That construction would render the restriction absolutely nugatory, and turn this part of the constitution into mere nonsense. The people would be made to say to the two houses, you shall be vested with the legislative power of the state, but no one shall be disfranchised or deprived of any of the rights or privileges of a citizen unless you pass a statute for that purpose; in other words, you shall not do wrong unless you choose to do it." Again, says the court in that case, " The meaning of the section then seems to be, that no member of this state shall be disfranchised, or deprived of any of his rights or privileges, unless the matter shall be adjudged against him upon trial had according to the course of the common law. It must be ascertained judicially that he has forfeited his privileges, or that some one else *has a superior title to the property* he possesses, before either of them can be taken from him. It cannot be done by mere legislation." The same principle was adjudged at an earlier day, in the *Matter of Albany-street,* (11 *Wend.* 149.) This principle is again recognized in the case of *Bloodgood* v. *Mohawk and Hudson Rail-Road Company,* (18 *Wend.* 9.)

But again, it seems to me that this act of the legislature must be adjudged void as controverting the sixth section of article one of the constitution of this state, which declares that " No person shall be subject to be twice put in jeopardy for the same offence; nor shall he be compelled in any criminal case to be a witness against himself, nor be deprived of *life, liberty or property,* without due process of law. Nor shall private property be taken for public use, without just compensation." (*Art.* 1, *sec.* 6, *Const.*) This is an exact copy of a part of the 7th section of article 7 of the former constitution of this state, and the expression "*nor be deprived of life, liberty or property, without due process of law,*" received judicial construction in the case of *Taylor* v. *Porter and Ford, supra ;* and the court, in com-

White *v.* White.

menting upon this part of the section, say : " The words ' *due process of law,*' in this place, cannot mean less than a prosecution or suit instituted and conducted according to the prescribed forms and solemnities for ascertaining guilt or determining the title to property. It will be seen that the same measure of protection against legislative encroachment is extended to life, liberty and property ; and if the latter can be taken without a forensic trial and judgment, there is no security for the others. If the legislature can take the property of A. and transfer it to B., they can take A. himself and either shut him up in prison or put him to death. But none of these things can be done by mere legislation. There must be due process of law." These same provisions of the present constitution were again considered by this court in the case of *Gilbert* v. *Foote,* in which case the court declared the statute entitled " *of proceedings for the draining of swamps, marshes, and other low lands,*" (2 *R. S.* 548,) unconstitutional. The case went to the court of appeals, and was affirmed by default, in that court, at the last January term thereof. This court deciding that as the statute authorized the taking of the property of the owner of the land, and transferring it to the applicant for the ditch, his heirs and assigns, against the consent of the owner, it was in conflict with these provisions of the constitution above referred to, and consequently void. This case has not yet been reported. The decision of the case of *Bloodgood* v. *The Mohawk & Hudson R. R. Co.* (18 *Wend.* 59,) was made in 1837 ; and the case of *Taylor* v. *Porter and Ford,* (4 *Hill,* 140,) was decided in 1843. In the latter case this general statute of the state was declared to be an infraction of these provisions of the constitution, and the principle decided in these cases was well understood by the framers of the present constitution ; and they must have appreciated the full force of the decision in the latter case, as they have provided by section seven of article one of the present constitution, that so far as private roads are concerned they may be opened in the manner to be prescribed by law, but have not extended the right to take private property for private use, beyond the case of opening private roads ; and from the very fact

that they have not, I think the inference is irresistible that they did not intend it should be.

But again ; I am not prepared to admit that the legislature of a state possesses any such power as would authorize them to take the property of one person and give it to another, against the consent of the owner, were there no such prohibitions contained in the constitution. It has been said that the British parliament is omnipotent ; but the great commentator upon the laws of England seems to think that when they speak of the omnipotence of parliament they use a figure of speech rather too bold. (1 *Black. Com.* 161.) But the omnipotence of parliament signifies nothing more than the supreme sovereign power of the state ; and I think therefore that De Lolme made an unwarrantable assertion, when he said that " it is a fundamental principle with the English lawyers, that parliament can do every thing but make a woman a man and a man a woman." The legislature, however, is not supreme under our form of government. It is only one of the organs of that absolute sovereignty which resides in the whole body of the people. (4 *Hill*, 144.) It was said by the late Justice Story, in the case of *Wilkerson* v. *Leland,* (2 *Peters,* 657,) " That a government can scarcely be deemed to be free when the rights of property are left solely dependent upon the will of a legislative body, without any restraint. The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred." Again, he says, " We know of no case in which a legislative act to transfer the property of A. to B. without his consent has ever been held a constitutional exercise of legislative power, in any state in the union. On the contrary, it has constantly been resisted as inconsistent with first principles, by every judicial tribunal in which it has been attempted to be enforced." I maintain, therefore, that the security of the citizen against such arbitrary legislation rests upon the broader and more solid ground of natural rights, and is not wholly dependent upon these negatives upon the legislative power contained in the constitution. It can never be admitted as a just attribute of sovereignty in a

White *v.* White.

government, to take the property of one citizen and bestow it upon another. The exercise of such a power is incompatible with the nature and object of all government, and is destructive of the great end and aim for which government is instituted, and is subversive of the fundamental principles upon which all free governments are organized. This was a power repudiated by the Romans during the whole reign of imperial despotism, and has ever been a maxim of the civil law. And the right of the subject against the exercise of such arbitrary power was asserted in England as one of the sovereign rights of the citizen, and forms a part of the 29th chapter of magna charta. I do not hesitate, in conclusion, to declare that the people of the state of New-York have never delegated to their legislature the power to divest the vested rights of property legally acquired by any citizen of the state, and transfer them to another, against the will of the owner. The legislature of this state can only lawfully exercise such powers as have been confided to it by the sovereign will of the people ; and when it usurps powers not intrusted to it by the sovereign power, its acts are as utterly void as those of the most inferior magistrate in the land, in a case where he has transcended his jurisdiction. It follows, therefore, that this act of the legislature under which the plaintiff has sought the relief claimed in this case, is void, and consequently can confer no rights upon her.(a) I have not, in declaring the deliberate judgment which I entertain in this case, been unmindful of the importance and delicacy of the duties devolving upon this court. We are called upon to declare an important statute of the state unconstitutional and void ; a statute deeply affecting the most important and delicate of the marital rights ; a statute, it is said, passed to repeal the common law and substitute the civil in its stead ; a law called for, it is alleged, by the popular voice of the state, and demanded by the onward progress of society. In a case like this, the court can never find a motive to transcend its duty, and I trust it will always be found to possess independence enough to do that. The defendant must have judgment upon the demurrer.

(a) See *Holmes* v. *Holmes*, (4 *Barb. Sup. Court Rep.* 295,) S. P.