HENRIETTA C. ADAMS *versus* COURTLAND PALMER.
SAME *versus* JOSEPH M. HODGKINS.
SAME *versus* MICHAEL SCHWARTZ.

Marriage is not a contract within the meaning of that clause of the constitution which prohibits the impairing the obligation of contracts.

A divorce granted by the Legislature is not invalid as impairing the obligation of contracts.

Such a divorce is valid in a case of which the Court, under existing laws, has no jurisdiction.

Especially, if it is granted by consent of the parties, and their consent may be inferred from their acts.

Prior to the Act of 1863 (c. 215) a release of dower, by a married woman under twenty-one years of age, was voidable.

The Act of 1863 (c. 215) cannot render valid a prior release of dower which was voidable when it was executed, and which, before the passage of the Act, had been avoided.

REPORTED from *Nisi Prius*, CUTTING, J., presiding.

These were all actions of DOWER, depending on the same facts.

The defendants denied the marriage, and alleged a release of dower by the demandant. The facts bearing upon the question of marriage are stated in the opinion. The demandants claimed to avoid the release, because, at the time of its execution, she was under the age of twenty-one years.

*A. Sanborn*, for the plaintiff.

*J. S. Rowe*, for Palmer.

*J. A. Peters*, for Palmer and Hodgkins.

*A. W. Paine*, for Hodgkins and Schwartz.

The opinion of the Court was drawn up by

APPLETON, C. J.—On the 31st July, 1846, by an Act of the Legislature of this State, Franklin Adams was divorced from Mary Adams, then his wife. On the 18th Aug., 1846, he was married to the demandant. The validity of this marriage depends on the constitutional authority of the Legislature to grant a divorce.

(1.) The power of the British Parliament to grant divorces is unquestioned. The Legislature of this, and of most other States of the Union, have granted divorces in numerous instances,—and, unless there are found express constitutional prohibitions, the exercise of this power for a series of years would seem to be no insignificant argument in favor of the rightfulness of such exercise. But when, as in this State, it has the weight of long continued legislative

usage, sanctioned by the authority of our highest judicial tribunal, manifest and conclusive error must be shown in the conclusions to which this Court arrived, to induce us to reverse a deliberately formed opinion, upon the strength of which the Legislature have based their subsequent action, and upon the faith of which parties have entered anew into marital relations.

Notwithstanding a practice, continuing since the origin of the government, and its sanction by the opinion of this Court, in 16 Maine, 479, it is urged that the Legislature have no constitutional authority to grant divorces; that marriage is a contract like other contracts, that its obligation cannot be impaired without violating the clause in the constitution of the United States prohibiting the passage of any "law impairing the obligation of contracts;" that a divorce does impair their obligation; that the dissolution of the marriage contract is a judicial and not a legislative act; and that, consequently, the divorce of Franklin Adams from his then wife, by the act of the Legislature, before referred to, was void, and his subsequent marriage to the demandant null.

The argument of the learned counsel for the tenant assumes that marriage is a contract, like other contracts, and within the protection of the constitutional provision just referred to, as such, for if not, this branch of the argument has no foundation upon which to rest.

Upon examination, it will be found that there are grave and important differences between marriage and other contracts. All contracts, as such, depend upon the mutual and concurring assent of the parties thereto. They agree upon the terms. They define the respective rights, duties and obligations of each to the other. The contract may be for a longer or shorter period of time. Its terms may be changed, modified or dissolved, as the parties may determine. If the contract be violated by the one, damages may be recovered by the other for such violation. While the contract remains in its original vigor, the rights of the parties are

ever the same—their obligations ever the same. Their rights cannot be impaired by the Legislature. The contract is the law of the parties in reference to its subject matter— and remains unaffected by any change of domicil by the parties. Its origin, its continuance, and dissolution depend upon their will.

The contract *to marry* is like other contracts and subject to the same law. It is a contract to enter into a given relation—a peculiar *status*. But, when once the contract *to marry* has been performed, the original contract, antecedent to such marriage, is at an end. The parties, having complied with its terms, they cease to have rights under or by virtue of it. A new relation has been entered into, and the mere assent of the parties to enter into such relation does not thereby make such relation a contract.

When the contracting parties have entered into the married state, they have not so much entered into a contract as into a new relation, the rights, duties and obligations of which rest, not upon their agreement, but upon the general law of the State, statutory or common, which defines and prescribes those rights, duties and obligations. They are of law, not of contract. It was of contract that the relation should be established, but, being established, the power of the parties, as to their extent or duration, is at an end. Their rights under it are determined by the will of the sovereign as evidenced by law. They can neither be modified nor changed by any agreement of parties. It is a relation for life ; and the parties cannot terminate it at any shorter period by virtue of any contract they may make. The reciprocal rights arising from this relation, as long as it continues, are such as the law determines from time to time, and none other.

The rights, duties and obligations arising under contracts are every where the same. Those of the marriage relation change with the change of domicil, and are dependent upon its laws. Foreigners do not bring with their families the laws relating to marriage of the place where they entered

into that relation. A marriage in France and a change of domicil to England, the law of husband and wife as established there governs the parties so long as their residence continues—to be modified anew by a further change of domicil. In other words, the legal obligations arising from the relation of marriage vary with that of the law of the State to whose jurisdiction the parties may be amenable. But at any given time, the law of marriage of any State, for all its inhabitants, is one and the same, but it may vary as the sovereign power of the State shall determine.

So, too, the law of divorce depends not upon that of the place, where the relation of marriage is entered into, but upon that of the place where the dissolution is sought to be obtained. The law of France would determine the causes of divorce, if sought for, while the parties were there domiciled. If they should change their domicil to America, the *lex loci*, where they should establish their residence, would prescribe the causes for and on account of which a dissolution of marital relations would be decreed. Nor is this all. The causes of divorce may be changed by the Legislature after marriage. They may be increased or diminished, and a divorce will be granted according to the law on that subject, when the libel is filed or the decree made, and not as it was when the ceremony of marriage was performed. New causes for divorce may be enacted, and the antecedent marriage will be dissolved for grounds subsequently deemed sufficient for its dissolution. Each State for itself is the exclusive judge of what shall be a valid cause for dissolving this relation, no matter when or where it was entered into.

Marriage, though in some of its aspects resembling a contract, is rather to be regarded as a social relation; a *status* with duties, rights and obligations established by the law of the State where the parties have their domicil, not by that of the State where the relation is formed; much less by that of their own will and pleasure. It is not then a contract within the meaning of the clause of the constitution, which prohibits the impairing the obligation of contracts. It is

rather a social relation like that of parent and child, the obligations of which arise not from the consent of concurring minds—but are the creation of the law itself; a relation the most important as affecting the happiness of individuals, the first step from barbarism to incipient civilization, the purest tie of social life, and the true basis of human progress.

" *Tunc genus humanum primum mollescere coepit.*"

That marriage is not to be regarded as a mere contract seems to be a view in accordance with the almost universal concurrence of authorities.   " Marriage," observes ROBERTSON, C. J., in *Maguire* v. *Maguire*, 7 Dana, 181, " though in one sense a contract, — because, being both stipulatory and consensual, it cannot be valid without the spontaneous concurrence of two competent minds, is nevertheless *sui generis*, and, unlike ordinary or commercial contracts, is *publici juris*, because it establishes fundamental and most important domestic relations.   And therefore, as every well organized society is essentially interested in the existence and harmony and decorum of all its social relations, marriage, the most elementary and useful of them all, is regulated and controlled by the sovereign power of the State, and cannot, like *mere contracts*, be dissolved by the mutual consent of contracting parties, but may be abrogated by the sovereign will, either with or without the consent of both parties, whenever the public good or justice to both or either of the parties will thereby be subserved.   Such a remedial and conservative power is inherent in every independent nation. * * And, therefore, marriage, being much more than a contract, and depending essentially upon the sovereign will, is not, as we presume, embraced by the constitutional interdiction of legislative acts impairing the obligation of contracts.   " The obligation is created by the public law, subject to the public will, and not to that of the parties." " Marriage," observes Mr. Justice STORY, in his Conflict of Laws, § 108, " is not treated as a mere contract between the parties, subject, as to its continuance, dissolution and

effects, to their mere pleasure and intentions. But it is treated as a civil institution, the most interesting and important in its nature of any in society." The same views are enforced with great ability by AMES, C. J., in *Ditson* v. *Ditson*, 4 R. I., 87. "Now marriage," he observes, " in the sense in which it is dealt with by a decree of divorce, is not a contract, but one of the *domestic relations*. In strictness, though formed by contract, it signifies the *relation* of husband and wife, deriving both its rights and duties from a source higher than any contract of which the parties are capable, and, as to these, uncontrolled by any contract they can make. When formed this is no more a contract than "fatherhood" or "sonship" is a contract, * * as every nation and State has an exclusive sovereignty and jurisdiction within its own territory, so it has exclusively the right to determine the domestic and social condition of the persons domiciled within that territory."

Not being a contract within the meaning of that term, as used in the constitution, legislative divorces are not invalid, as impairing the obligation of contracts. *Starr* v. *Pease*, 8 Conn., 541; 16 Maine, 480; Bishop on Marriage and Divorce, § 775; *White* v. *White*, 5 Barb., 474.

Neither is a divorce to be regarded as strictly a judicial and not a legislative act. "There would, therefore, upon principle, seem to be no reason why the granting of a divorce should not be either a legislative or a judicial act; legislative, when it is performed as a mere exercise of sound discretion, for the good of the parties and of the public, in which case vested rights could not be divested, but only their social relation or *status* for the future ascertained and established; judicial, when the divorce is demanded as a right under established laws, in consequence of some breach of duty committed by the offending party." Bishop on Mar. and Div., § 787. Thus, in England, although divorces may be granted by the courts, still the power of Parliament to grant them none the less exists.

But, if this were more questionable than we deem it to be, it

cannot be doubted that the *status* of parties may be changed by the Legislature, with their mutual consent; and such consent need not be express, but may be implied. In the case before us, the assent of the parties may be inferred from the act itself and their subsequent conduct. The husband was to pay a certain sum, within a limited time, to the previously appointed trustee of the wife, for her benefit. This he did, and the wife, or her trustee, received the payment. She ceased to claim a continuance of her marital rights. Nay, more, she entered into new marital relations, and hence, neither objected to, nor was in a condition to object to the new ties which her husband had formed with the demandant.

The result is, that the divorce of Franklin Adams from his former wife was legal, and his marriage with the demandant valid.

(2.) The demandant, while yet a minor, on 1st Dec., 1849, released her right of dower, by joining with her husband in a deed of the demanded premises of that date, to Amos M. Roberts, through whom the tenant derives his title.

The marriage between the demandant and Franklin Adams was, then, legal. During their intermarriage, he was seized in fee of the premises in which dower is demanded. He has deceased, and, since his death, his widow has demanded dower therein, which being refused, she has commenced this suit.

Upon these facts, she has a right to have dower assigned her by the common law. So, the statute then in force gave her dower "unless lawfully barred thereof." R. S., 1841, c. 95, § 1.

The mode by which dower could be "lawfully barred" is provided by § 9 :—"A married woman may bar her right of dower, in any estate conveyed by her husband, by joining with him as a party in the deed of conveyance, and thereby releasing her claim of dower, or by a subsequent deed executed jointly with her husband, or legally authoriz-

ed guardian of her husband." As the demandant joined with her husband in his deed, she would be barred thereby, unless by reason of her infancy she can avoid her deed, which she attempts to do.

The statute in question manifestly refers only to the disability arising from the marriage relation. But at this time the wife was laboring under another and distinct disability — that arising from her infancy.

The disability from marriage arises from the presumed influence or possible coërcion of the husband. That of the minor, from the want of sufficient business capacity to act understandingly in the affairs of life. These are separate and distinct disabilities. They may exist separately or they may coëxist. When coëxisting, the removal of one is in no way the removal of the other. If the wife had been insane, she might have avoided her deed. So it is with infancy. 1 Washburn on Real Property, 199. *Priest* v. *Cummings*, 16 Wend., 617; S. C. 20 Wend., 338. *Sandford* v. *Mc-Lean*, 3 Paige, 117; *Webb* v. *Hall*, 35 Maine, 336. The case of *Sherman* v. *Garfield*, 1 Denio, 329, is directly in point. The Supreme Court of New York there held, that a prior wife surviving her husband could maintain ejectment for dower notwithstanding her conveyance while a minor, although she had done nothing to disaffirm it. That this is the right construction is established as well by the authorities cited, as by the Act of 1863, c. 215, by which the release of dower by a married woman *of any age*, &c., is made valid. The insertion of the words "of any age" clearly enlarge the meaning of the section and were so intended, else there would have been no necessity for their insertion.

(3.) The demandant not being bound by the then existent law might avoid her deed and recover dower. This she has undertaken to do. She has demanded dower, commenced her suit for its recovery; and is entitled to recover her rights, as existing when her suit was brought, unless they have been divested by the Act of 1863, c. 215, § 1,

Adams *v.* Palmer.

which is in these words :—" The release of dower by a married woman of *any age, now* or hereafter made, by joining in the deed of her husband in the manner required by law, shall be valid."

This section is undoubtedly effective as to the future. The material question is whether, as to the past, it establishes a new rule by which courts are to be governed.

The release of the demandant was voidable. It has been avoided. Having been avoided, it is as if it had never been made. The demandant, therefore, is in the same position as any other demandant in dower. But the right of a widow to recover dower differs not from that of a demandant in ejectment, seeking to recover premises of which he has been disseized. Both are mere rights—both property. The ·right to recover an estate in dower and to recover one in fee, rest alike upon the same law. The same reasoning which would authorize the Legislature to transfer, by Act, the estate of the widow to the reversioner, would equally authorize the transfer of the fee to the demandant in dower. The demandant in dower and the demandant in ejectment, are both seeking to obtain possession. Their rights rest alike in action. That one is more valuable than the other in no way affects the question. The sanctity, the law throws around the one, is not greater than the protection, it affords the other.

If dower had been assigned, could the Legislature, by a change of law affecting the past, declaring that to be law which was not *then* law, take the estate in dower, thus legally assigned, and transfer it to another? If it could do this as to a doweress, what safety would the owner in fee have, that his estate might not be liable to a similar exercise of legislative power? The difference between the case supposed and the one at bar, consists only in this—that, in the former, dower has been assigned and the doweress is in possession, while, in the latter, she is seeking to recover that possession. In the one case it is the right *of* possession ; in the other, the right to be *in* possession.

Before the passage of the Act of 1863, c. 215, the demandant, by the preëxisting law, was entitled to dower, because, not being barred by her release, by reason of her infancy, her rights were the same as if it had not been given. She stood precisely as every other widow with an unquestioned right of dower. Has the Act deprived her of that right? In other words—for it comes to that—can the right of a widow to recover dower be taken from her by an Act of the Legislature and given to the reversioner? If so, the tenure by which her rights—by which all rights are held, depend, not on the law as existing when they became vested, but upon the fluctuating will of a legislative assembly. No rights are or can be secure. The arbitrary will of the Legislature controls alike the past and the present, as well as establishes the law for the future.

It is provided by the constitution of this State, art. 1, § 6, that no one shall "be deprived of his life, liberty, PROPERTY, or privileges, but by the judgment of his peers or the laws of the land."

A widow to whom dower has been assigned is thereby seized of a freehold estate. Before its assignment, it is a vested right to recover a freehold; differing from a vested right to recover an estate in fee, of which one has been disseized, mainly in the lesser interest at stake. One is as much property as the other. Both are alike entitled to the protection which the constitution guaranties to the PROPERTY of the citizen.

"The law of the land," remarks TENNEY, J., in *Saco* v. *Wentworth*, 37 Maine, 171, "does not mean an Act of the Legislature; if such was the true construction, this branch of the government could at any time take away life, liberty, *property* and privilege, without a trial by jury." "The words 'by the law of the land,' as here used," remarks BRONSON, J., in *Taylor* v. *Porter*, 4 Hill, 140, referring to the constitution of New York, "do not mean a statute passed for the purpose of working the wrong. That construction would render the restriction absolutely nugatory,

and turn this part of the constituton into absolute nonsense. The people would he made to say to the two houses, you shall be vested with the legislative power of the State, but no one shall be disfranchised or deprived of any of the rights and privileges of a citizen, unless you pass a statute for that purpose; in other words, you shall do no wrong unless you choose to do it." "An Act of the assembly whereby a man's property is swept away from him without a hearing, trial or judgment, or the opportunity of making known his rights or producing his evidence, is not a *law of the land* within the meaning of the 9th section of the declaration of rights, as set forth in the constitution of Pennsylvania. By the law of the land, as set forth in the constitution of Pennsylvania, is meant the law of an individual case as established in a fair and open trial, or an opportunity given for such a trial in open Court, and by due course and process of law." *Brown* v. *Hummell*, 6 Barr., 86. In other words, no one shall be deprived of his property, unless by one having a superior right or title thereto judicially established. It cannot be done by mere legislation. It is for the Legislature to prescribe laws for the future. It is for the Courts to apply the law as then existent to the facts as ascertained by proof.

Acts similar to the one under examination have not unfrequently received the consideration of Courts and with an almost uniform result. An Act of the assembly legitimating the children of a bastard cannot divest an estate which had previously passed, by the death of the mother of the bastard, to her heirs at law. `Norman* v. *Heist*, 5 W. & S., 171. "The right of property," observes GIBSON, C. J., in delivering the opinion of the Court in the case just cited, "has no foundation or security but the law; and when the Legislature shall successfully attempt to overturn it, even in a single instance, the liberty of the citizen will be no more. The estate was lawfully *vested* in the plaintiffs, who were the next heirs to their intestate sister, at her death; it was guaranteed to them by the constitution and the laws; and to

have despoiled them of it, in favor of the supposed natural right of the grandchildren, would have been as much an act of despotic power, as it would be had the grandchildren been strangers to the intestate's blood." So the Legislature of Pennsylvania passed an Act directing "that every last will and testament *heretofore* made, or *hereafter* to be made, &c., to which the testator has made his mark or cross, shall be valid. This was held unconstitutional as to a. will dated and proved *before* its passage. *Greenough* v. *Greenough*, 1 Jones, 489. "It is destitute of retroäctive force, not only because it was an Act of judicial power," observes GIBSON, C. J., "but because it contravenes the declaration in the 9th section of the 9th article of the constitution, that no person shall be deprived of life, liberty and *property*, except by the judgment of his peers and the law of the land. Taking the proof of the execution, at this stage of the argument, to be defective, under the Act of 1833, it would follow that the plaintiff had become the owner of a third of the property in contest, by the only assurance any man can have in his property — the law. Yet the Legislature attempt to divest him of it, by a general law, it is true, but one infringing on particular rights." In *Killam* v. *Killam*, 1 Am. Law Register, 18, the same Court held that an estate already descended could not be divested from the legal heirs and given to the bastard child of an intestate, by a subsequent statute of legitimation; but the Legislature may cure the taint of a bastard blood for the purposes of future inheritance. In *White* v. *White*, 5 Barb., 474, it was held that the statute of New York, for the more effectual protection of the property of married women, so far as it purported to deprive the husband of his *then* existing right over the property of his wife, was unconstitutional and void. It was valid in its prospective operation, but could not deprive the husband of his vested rights of property.

In *Westerveldt* v. *Gregg*, 2 Kernan, 203, it was held that the husband had a vested interest in a legacy, which was bequeathed to his wife, before the passage of the Act

Adams *v.* Palmer.

for the more effectual protection of the property of married women, though the legacy *had not been reduced to* possession when the Act took effect; and that the Legislature had not the power to deprive the husband of his rights to such property and make it the sole and only property of the wife; and that, so far as the Act purports to do so, it violates the provision of the constitution which declares that no person shall be deprived of "property without due process of law." "A right to reduce a chose in action to possession, is one thing," observes EDWARDS, J., "and a right to the property which is the result of the process by which the chose in action has been reduced to possession, is another and different thing. But they are both equally vested rights. The one is a vested right to obtain the thing, with the certainty of obtaining it by resorting to the necessary proceedings, unless there be a legal defence, and the other is a vested right to the thing, after it has been obtained. * * The husband was then entitled to receive the legacy as his own, by taking the necessary legal proceedings, and he will now be entitled to receive it, unless the right which he then had has been taken away, and, if that right has been taken away, he has lost a vested right of the value of the legacy in question." But this, the Court held, was not the case, and that the Act, so far as it purported to interfere with the right of the plaintiff anterior to its passage, was void. The same views were affirmed in *Norris* v. *Boryea*, 3 Kernan, 288. So, in *Strong* v. *Cline*, 12 Indiana, 37, it was held, that, though a statute cannot take away the vested rights of dower or courtesy, it can those which are merely inchoate. These general principles, denying the power of the Legislature to take away vested rights from one and transfer them to another, have likewise received the deliberate and repeated approval of this Court, as well as of the Supreme Court of the United States. *Kennebec Purchase* v. *Laboree*, 2 Maine, 275; *Austin* v. *Stevens*, 24 Maine, 250; *Webster* v. *Cooper*, 14 How., 488.

The cases cited by the counsel for the tenant will mainly

be found to be those in which a perfect legal right would have been created, but for an accidental omission of some formality required by the statute.   Thus, in *Pratt* v. *Jones*, 25 Vt., 303, a statute of Vermont, making levies valid, notwithstanding certain informalities, was held constitutional, though applicable to levies made before its passage.   Referring to the Act in question, REDFIELD, C. J., says : — " It pertained purely to the remedy, and was, in effect, enlarging the remedy, instead of restricting it, and advancing the right on one side, without denying it on the other.   If this levy was of the nature of a contract between the parties, or a statute bar, it might be more questionable how far the Legislature could divest it.   But, as it was, it seems to us not in any sense to impair or vary the obligation of the contract, but only to *qualify the effect of certain evidence*, created by the plaintiff altogether under a misapprehension of its effect; and thus to advance the remedy, and disturb no rights, which the law can recognize as valuable, or justly entitled to be regarded as inviolable."   But, when the sheriff's sale is absolutely void, a confirmatory Act will be of no avail. *Dale* v. *Medcalf*, 9 Barr., 110.

In *Watson* v. *Mercer*, 8 How., U. S., 88, an Act of the State of Pennsylvania, providing that no deed, &c., should be " deemed, held and adjudged invalid, or defective, or insufficient in law, or avoided, or prejudiced, by reason of any informality or omission in setting forth the particulars of the acknowledgement, &c., in the certificate thereof," was held constitutional.   " The Act," observes STORY, J., in delivering the opinion of the Court, " supposes the titles of the *femes covert* to be good, however acquired; and only provides that deeds of conveyance, made by them, shall not be void, because there is a defective acknowledgement of the deeds by which they have sought to transfer their title. So far, then, as it has any legal operation, it goes to *confirm* and not to impair the contract of the *feme covert*."   In *Satterlee* v. *Matthewson*, 2 Pet., 380, the decree of the Court is best sustained by the opinion of Mr. Justice JOHNSON,

who concurred in the result to which the rest of the Court arrived, but who resisted the "portentous doctrines," as he termed them, announced by Mr. Justice WASHINGTON. In *Wilkinson* v. *Leland*, 2 Pet., 627, a statute, confirming the sale of the property of infant heirs, to pay the debts of the decedent, was held valid. But, at that time, the State of Rhode Island had no constitution, but was acting under its original charter derived from the king. But, in delivering the opinion of the Court, STORY, J., remarks, "we know of no case in which a legislative Act, to transfer the property of A to B without his consent, has ever been held a constitutional exercise of legislative power in any State of the Union. On the contrary, it has been constantly resisted as inconsistent with just principles by every judicial tribunal in which it has been attempted to be enforced. We are not prepared, therefore, to admit that the people of Rhode Island have ever delegated to the Legislature the power to *divest* the *vested* rights of property and transfer them, without the assent of the parties."

So, too, where a legal right to property exists in persons incapable, by reason of some disability, as insanity, infancy, &c., of exercising the ordinary functions of ownership, statutes have been enacted authorizing the sale or pledge of their property to raise money for their necessities — and their validity has been sustained, when the application of the money thus produced would not alter the rights of the parties. But this is merely the removal of a temporary bar to the complete enjoyment of property — the mere modification of previous legislation.

But the cases to which we have been referred differ entirely from the one at bar. The Act in question is not a confirmatory Act. The release of the demandant was voidable and was avoided before its passage. It was as though it had never been. There was no release to confirm, because it had previously been avoided. An insane person may execute a deed, and when sane, may avoid it. So may a minor avoid his conveyances when he arrives at full age.

But, after the sane man has avoided his contracts made when insane, and the man of full age, those of his infancy, can the Legislature breathe life into the acts thus avoided, and make valid the avoided deed of the insane man, or render the rescinded contract of the infant binding? It would be to decree that parties should be bound by cancelled deeds or rescinded contracts.

The avoidance of a deed is as much an act as its execution: The rescission of a contract is as much an act as the making of one. Now the statute in question, if valid, does not so much confirm a deed, by retrospectively removing the then existing disability of infancy, as it imposes a disability upon the demandant by annulling her act of avoidance done when by the law she was perfectly competent to act. The confirming a voidable deed *before* its avoidance is one thing; to confirm it after it has been avoided is another and different thing, and that is precisely what the statute does, if effectual. Whether the statute under consideration be regarded as an attempt to render valid a voidable deed after its avoidance, or as annulling a valid act after its execution, or as an union of both, is immaterial. Both are alike beyond the legitimate functions of legislation.

The result is, that the Act of 1863, c. 215, so far as it is prospective in its operation, is valid and binding, but it cannot divest the demandant of rights vested in her before its passage under and by virtue of preëxistent law.

*The cases to stand for trial.*

CUTTING, DAVIS, KENT, DICKERSON and BARROWS, JJ., concurred.