MAINE SUPREME JUDICIAL COURT                        Reporter of Decisions
Decision:       2022 ME 48
Docket:         BCD-21-416
Argued:         May 10, 2022
Decided:        August 30, 2022

Panel:          STANFILL, C.J., JABAR and HORTON, JJ., CLIFFORD, A.R.J., and HUMPHREY, A.R.J.*

NECEC TRANSMISSION LLC et al.

v.

BUREAU OF PARKS AND LANDS et al.

STANFILL, C.J.

[¶1]  The New England Clean Energy Connect project (the Project) is designed to transmit power generated in Québec through Maine and into Massachusetts.  The Project includes a new 145.3-mile, high-voltage direct current (HVDC) transmission line, proposed to run from the Maine-Québec border in Beattie Township to a new converter station in Lewiston and from there to an existing substation by a new 1.2-mile, high-voltage alternating current transmission line.  Of the Project's five segments, segment 1—a 53.1 mile-long HVDC transmission line running along a corridor from Beattie Township to the Forks Plantation—is the most controversial because it

---

* Justice Humphrey sat at oral argument and participated in the initial conference while he was an Associate Justice and, as directed and assigned by the Chief Justice, is now participating in this appeal as an Active Retired Justice.

2

must be cut through commercial timberland and will cross hundreds of wetlands, waterways, and other wildlife habitats, as well as public land.

[¶2] On November 2, 2021, fifty-nine percent of Maine voters approved the following ballot question through a public referendum:

> Do you want to ban the construction of high-impact electric transmission lines in the Upper Kennebec Region and to require the Legislature to approve all other such projects anywhere in Maine, both retroactively to 2020, and to require the Legislature, retroactively to 2014, to approve by a two-thirds vote such projects using public land?[1]

Though the question did not mention the Project, the legislation enacted by the voters (the Initiative) effectively precludes the Project.[2]

[¶3] On November 3, 2021, NECEC Transmission LLC and Avangrid Networks, Inc. (collectively, NECEC),[3] filed a complaint for declaratory

---

[1] Section 4 of the Initiative requires legislative approval of the construction of any high-impact transmission line in addition to a CPCN from the PUC. I.B. 2021, ch. 1, § 4 (effective Dec. 19, 2021). Section 5 of the Initiative bans the construction of any high-impact transmission line in the "Upper Kennebec Region," defined as "the approximately 43,300 acres of land located between the Town of Bingham and Wyman Lake, north along the Old Canada Road, Route 201, to the Canadian border, and eastward from the Town of Jackman to encompass Long Pond and westward to the Canadian border, in Somerset County and Franklin County." I.B. 2021, ch. 1, § 5 (effective Dec. 19, 2021). Section 6 requires sections 4 and 5 to be applied retroactively to September 16, 2020. I.B. 2021, ch. 1, § 6 (effective Dec. 19, 2021).

[2] Consistent with the terminology used by the trial court and the parties, we use "the Initiative" throughout this opinion to refer to the legislation enacted by the passage of the citizens' initiative question in November 2021. *See* I.B. 2021, ch. 1, §§ 1-6 (effective Dec. 19, 2021). The Initiative was the second attempt at a citizens' initiative to curtail the Project; we held the first proposed initiative unconstitutional in *Avangrid Networks, Inc. v. Sec'y of State*, 2020 ME 109, ¶¶ 35-38, 237 A.3d 882.

[3] NECEC Transmission LLC owns the Project; Avangrid owns NECEC Transmission LLC and is the indirect parent company of Central Maine Power Company (CMP). CMP, together with H.Q. Energy

judgment in the Superior Court alleging, among other things, that retroactive application of the Initiative to the Project, as required by section 6, is unconstitutional on a variety of grounds.  The complaint named the Bureau of Parks and Lands, the Public Utilities Commission (PUC), the Maine Senate, and the Maine House of Representatives as defendants (collectively, the State parties).  Thirteen organizations and individuals were granted intervenor status in the trial court.[4]

[¶4]  NECEC moved to preliminarily enjoin the Initiative from becoming law.  After transfer to the Business and Consumer Docket, and following the denial of NECEC's request for a preliminary injunction, the trial court (*Duddy, J.*) reported the case to us pursuant to M.R. App. P. 24(c). We accept the report and frame the question of law raised by the court's reported interlocutory ruling as follows:

---

Services (U.S.) Inc., originally entered into transmission services agreements with several Massachusetts electricity distribution companies to transmit electricity through the Project.  CMP ultimately transferred all of its rights and responsibilities in the Project to NECEC Transmission LLC.

[4]  The following parties intervened on the side of NECEC: H.Q. Energy Services (U.S.) Inc., Cianbro Corporation, International Brotherhood of Electrical Workers Local 104, Industrial Energy Consumer Group, and the Maine State Chamber of Commerce.  The following parties intervened on the side of the State appellees: NextEra Energy Resources, LLC (NextEra); the Natural Resources Council of Maine (NRCM); and individuals Thomas B. Saviello, Christine M. Geisser, Wendy A. Huish, Jonathan T. Hall, Theresa E. York, and Robert C. Yorks (the West Forks residents).

4

> Would retroactively applying sections 4 and 5 of the Initiative to the certificate of public convenience and necessity (CPCN) issued for the Project, as required by section 6, violate due process under the Maine Constitution, Me. Const. art. I, § 6-A, if NECEC undertook substantial construction consistent with and in good-faith reliance on the CPCN before the Initiative was enacted?

Answering that question, we hold that section 6 of the Initiative is unconstitutional to the extent it requires sections 4 and 5 to be applied retroactively to the CPCN if the appellants have acquired vested rights to proceed with Project construction. We therefore remand to the Business and Consumer Docket for further proceedings consistent with this opinion.

## I. BACKGROUND

[¶5] The interlocutory ruling underlying this case is before us pursuant to M.R. App. P. 24(c), on report from the Business and Consumer Docket. Given that procedural posture, the following facts are taken from the reported ruling and our opinion affirming the PUC's order granting the CPCN for the Project, *NextEra Energy Res., LLC v. Me. PUC,* 2020 ME 34, 227 A.3d 1117, and are limited to those facts relevant to the question of law that we now answer. *See Littlebrook Airpark Condo. Ass'n v. Sweet Peas, LLC*, 2013 ME 89, ¶ 9, 81 A.3d 348 (outlining the limited scope of review for reported interlocutory rulings).

## A.     Project Permitting and Other Governmental Approvals

[¶6]  On September 27, 2017, CMP filed a petition with the PUC to obtain a CPCN for the Project.  *NextEra Energy Res., LLC*, 2020 ME 34, ¶ 3, 227 A.3d 1117.   The PUC held many days of public and evidentiary hearings and conferences and received well over one thousand public comments regarding CMP's petition.  *Id.* ¶ 6.  On May 3, 2019, the PUC concluded that the Project meets the statutory public-need standard and unanimously voted to grant CMP a CPCN to construct and operate the Project, all at no cost to Maine electricity customers.  *Id.* ¶¶ 6-10.

[¶7]  Appellee-Intervenor NextEra intervened in the PUC proceeding and appealed to us from the order granting the CPCN.  *Id.* ¶¶ 5, 11.  We affirmed the PUC's decision on March 17, 2020, concluding that the PUC's determination, findings of fact, and application of the law were supported by the voluminous record.  *Id.* ¶ 43.

[¶8]   In addition to the CPCN, NECEC and CMP obtained multiple authorizations from various government entities before beginning construction on the Project.  NECEC applied for permits from the Department of Environmental Protection (DEP) as required under the Natural Resources Protection Act, 38 M.R.S. §§ 480-A to 480-JJ (2017), and the Site Location of

6

Development Act, 38 M.R.S. §§ 483-A, 484, 487-A (2017), as well as for a Site Law Certification from the Land Use Planning Commission (LUPC), *see* 12 M.R.S. § 685-B (2017). On May 11, 2020, the DEP approved NECEC's permit application in an order that also incorporated the LUPC's certification. Appellees-Intervenors NextEra, NRCM, and the West Forks residents appealed the DEP's order to the Superior Court and the Board of Environmental Protection (BEP) and moved to stay the order. The Superior Court denied their motion to stay the DEP's order. *NextEra Energy Res., LLC v. Dep't of Env't Prot.*, 2021 Me. Super. LEXIS 14 (Jan. 8, 2021). On November 23, 2021, the DEP suspended the permit it had issued pending the outcome of this case. The appeal to the BEP remained pending when this case was filed in the Superior Court.[5]

[¶9] NECEC and CMP also secured a permit from the United States Army Corps of Engineers under the Clean Water Act and the Rivers & Harbors Act (the ACE permit). *See* 33 U.S.C.S. § 1344 (LEXIS through Pub. L. No. 117-66); 33 U.S.C.S. § 403 (LEXIS through Pub. L. No. 117-116). The Sierra Club, NRCM,

---

[5] The status of some of these proceedings has changed during the time that this case has been pending, but that information is not part of the formal record before us. *See, e.g.*, Edward D. Murphy, *State Environmental Board Denies Appeal of Transmission Line Project*, Portland Press Herald (July 21, 2022), https://www.pressherald.com/2022/07/21/state-environmental-board-denies-appeal-of-transmission-line-project/.

and the Appalachian Mountain Club (AMC) sued the Army Corps of Engineers to enjoin the ACE permit, alleging that the environmental assessment underlying the permit was insufficient and that the Corps should have instead completed a full environmental impact statement. Following an emergency appeal of the denial of a preliminary injunction, on January 15, 2021, the United States Court of Appeals for the First Circuit enjoined construction on segment 1 of the Project pending appeal. The First Circuit vacated the partial injunction on May 13, 2021, *Sierra Club v. U.S. Army Corps of Eng'rs*, 997 F.3d 395 (1st Cir. 2021), but the case remains pending.

[¶10] Separately, CMP received a presidential permit from the United States Department of Energy (DOE) on January 14, 2021. *NECEC Transmission LLC*, DOE Docket No. PP-438, Presidential Permit (DOE Jan. 14, 2021); *see* Exec. Order No. 10,485, 3 C.F.R. 106 (1953), *amended by* Exec. Order No. 12,038, 3 C.F.R. 136 (1978). Thereafter, the Sierra Club, NRCM, and AMC amended their pending complaint regarding the ACE permit to include claims relating to the presidential permit.

[¶11] Finally, NECEC obtained municipal permits and approvals requiring compliance with local rules in most municipalities through which the

Project will pass. At the time this case was filed, NECEC had not yet secured permits and approvals from four municipalities.

[¶12] In addition to the aforementioned permits and approvals, NECEC (through CMP) needed a lease from the Bureau of Parks and Lands for the 0.9-mile stretch of the Project that crosses public reserved lands in Johnson Mountain Township and West Forks Plantation. In 2014, CMP had obtained a lease from the Bureau to construct electric transmission facilities, and in 2020 CMP entered into an amended lease (the BPL lease) superseding the 2014 lease for the public reserved lands through which the Project would pass.[6]

[¶13] In June 2020, Senator Russell Black filed a complaint in the Superior Court against the Bureau, alleging the BPL lease violated article IX, section 23 of the Maine Constitution. The Business and Consumer Docket (*Murphy, J.*) vacated the BPL lease, *Black v. Cutko*, No. BCDWB-CV-2020-29, 2021 WL 3700685 (Me. B.C.D. Aug. 10, 2021), and that decision was appealed to us, *Black et al. v. Bureau of Parks and Lands et al.*, No. BCD-21-257. After Senator Black moved to lift the automatic stay on the judgment, we issued an agreed-upon order prohibiting NECEC from building on the leased

---

[6] CMP assigned its interest in the 2020 BPL lease to NECEC Transmission LLC on January 4, 2021.

public reserved lands until the legal questions regarding the BPL lease have been resolved. *See* M.R. Civ. P. 62(e), (g).

[¶14] In summary, at the time this case was filed, (1) the DEP permit (incorporating the LUPC Site Law certificate) was still pending on appeal before the BEP, (2) the ACE permit and the presidential permit from the DOE were the subjects of a lawsuit in federal court, (3) the BPL lease was the subject of a direct appeal to us in another case, and (4) not all necessary municipal approvals had been obtained. The only Project-wide permit or approval that was final when this case was filed was the CPCN from the PUC—an order that we affirmed and that is not subject to any further review.

## B.    Project Construction

[¶15] The Project is divided into five segments. Segment 1 includes 53.1 miles of HVDC line along a new corridor running from Beattie Township at the Canadian border to the Forks Plantation. Segments 2 and 3 cover approximately 92 miles of transmission line along an existing corridor that will be widened. Segments 4 and 5 focus on network upgrades, including a 26.5-mile transmission line from Lewiston to Wiscasset.

[¶16] NECEC received the final Project-wide permit—the presidential permit from the DOE—on January 14, 2021. On January 18, 2021, NECEC

started clearing and construction activities in segments 2 through 5 of the Project. On May 15, 2021, NECEC commenced construction on segment 1 of the Project, the 53.1 miles from the Canadian border to the Forks Plantation.

[¶17]  According to the preliminary injunction record, NECEC had spent nearly $450 million on the Project, approximately forty-three percent of the projected total cost, as of November 3, 2021, when this case was filed in the Business and Consumer Docket.  Between January 18, 2021, and the time the Project was halted following the referendum in November 2021, NECEC cut approximately 124 miles of right-of-way for direct current lines, cleared the entire corridor for the alternating current line, erected transmission structures along the corridor, and prepared the converter station site.

## C.    The 2021 Citizens' Initiative

[¶18]  As we recently reiterated in connection with a related citizens' initiative:

> The broad purpose of the direct initiative is the encouragement of participatory democracy.  By [article IV, part third,] section 18 [of the Maine Constitution,] the people, as sovereign, have retaken unto themselves legislative power, and that constitutional provision must be liberally construed to facilitate, rather than to handicap, the people's exercise of their sovereign power to legislate. . . . [S]ection 18 cannot be said merely to *permit* the direct initiative of legislation upon certain conditions.  Rather, it reserves to the people the *right* to legislate by direct initiative if the constitutional conditions are satisfied.

*Avangrid Networks, Inc.*, 2020 ME 109, ¶ 15, 237 A.3d 882 (quoting *McGee v. Sec'y of State*, 2006 ME 50, ¶ 25, 896 A.2d 933).

[¶19]  In accordance with the Maine Constitution's provision for direct initiative of legislation, Me. Const. art. IV, pt. 3, § 18, voters circulated a petition for a citizens' initiative affecting the Project beginning on October 30, 2020.  On February 22, 2021, the Secretary of State determined that the petition had garnered enough valid signatures to present the initiated bill to the Legislature. *See id*. § 18(2); 21-A M.R.S. § 905(1) (2022).  Though presented with the bill, L.D. 1295 (130th Legis. 2021), the Legislature did not act on the measure before adjourning *sine die* on March 30, 2021.  *See* Me. Const. art. IV, pt. 3, § 18(2).  As a result, a ballot question summarizing the initiated bill was submitted to the public for a vote in November 2021.  *See id*. § 18(2)-(3); *see generally Caiazzo v. Sec'y of State*, 2021 ME 42, ¶¶ 2-5, 256 A.3d 260.

[¶20]  On November 2, 2021, fifty-nine percent of Maine voters approved the initiated bill, which took effect on December 19, 2021, and effectively halted the Project.  The legislation enacted through the Initiative consists of six sections, four of which effect statutory changes with implications for the Project.[7]  I.B. 2021, ch. 1, §§ 1-6 (effective Dec. 19, 2021).  We do not address

---

[7]  NECEC argues that the sections of the Initiative are not severable and therefore the entire Initiative must fall if we conclude that any section is unconstitutional.  However, we need not consider

12

sections 2 and 3 of the Initiative because no one challenges their constitutionality.

[¶21] Section 1 of the Initiative amends 12 M.R.S. § 1852 (2021), which governs the Bureau's authority to lease public reserved lands, by requiring legislative approval for leases for transmission lines retroactively to September 16, 2014. I.B. 2021, ch. 1, § 1 (effective Dec. 19, 2021). The effect of section 1 upon the portion of the Project involving public reserved land is the subject of the separate appeal in *Black et al. v. Bureau of Parks and Lands et al.*, No. BCD-21-257, and is more appropriately addressed in that context rather than on report under M.R. App. P. 24(c). *See Littlebrook Airpark Condo. Ass'n*, 2013 ME 89, ¶ 9, 81 A.3d 348.

[¶22] Sections 4, 5, and 6 of the Initiative amend 35-A M.R.S. § 3132 (2021), the statute requiring project developers to obtain a CPCN from the PUC before constructing certain transmission lines. I.B. 2021, ch. 1, §§ 4-6 (effective

the issue of severability because the parties failed to preserve it in the trial court. *MP Assocs. v. Liberty*, 2001 ME 22, ¶ 18, 771 A.2d 1040. Even if the issue were preserved, the separate sections of the Initiative would be severable. *See* 1 M.R.S. § 71(8) (2022) (codifying the general rule of statutory construction that "[t]he provisions of the statutes are severable"); *Lambert v. Wentworth*, 423 A.2d 527, 535 (Me. 1980) (establishing the presumption of severability in statutes whose unconstitutional provisions are separate and independent from the valid provisions); *see also* 16A Am. Jur. 2d *Constitutional Law* § 211 ("[I]f a statute is unconstitutional as applied, the state may continue to enforce that statute in different circumstances where it is not unconstitutional, and if a statute has unconstitutional applications, they are severable from the constitutional applications." (footnotes omitted)).

Dec. 19, 2021).  Those sections do not affect the authority of any executive agency other than the PUC, nor do they affect any of the many permits or approvals obtained by the Project except the CPCN.

[¶23]  Section 4 of the Initiative enacts 35-A M.R.S. § 3132(6-C) (2022)[8] and provides that "[i]n addition to obtaining a [CPCN], a high-impact electric transmission line may not be constructed anywhere in the State without first obtaining the approval of the Legislature."  I.B. 2021, ch. 1, § 4 (effective Dec. 19, 2021).  Section 5 of the Initiative enacts 35-A M.R.S. § 3132(6-D) (2022),[9] which

---

[8]  Section 4 states in full as follows:

> **Sec. 4.  35-A MRSA §3132, sub-§6-C** is enacted to read:
>
> **6-C.  High-impact electric transmission line; legislative approval.**  In addition to obtaining a certificate of public convenience and necessity, a high-impact electric transmission line may not be constructed anywhere in the State without first obtaining the approval of the Legislature, except that any high-impact electric transmission line crossing or utilizing public lands designated by the Legislature pursuant to Title 12, section 598-A is deemed to substantially alter the land and must be approved by the vote of 2/3 of all the members elected to each House of the Legislature.

I.B. 2021, ch. 1, § 4 (effective Dec. 19, 2021).

[9]  Section 5 states in full as follows:

> **Sec. 5.  35-A MRSA §3132, sub-§6-D** is enacted to read:
>
> **6-D.  High-impact electric transmission line; geographic prohibition.**  Notwithstanding subsection 6-C, a high-impact electric transmission line may not be constructed in the Upper Kennebec Region.  For the purpose of this subsection, "Upper Kennebec Region" means the approximately 43,300 acres of land located between the Town of Bingham and Wyman Lake, north along the Old Canada Road, Route 201, to the Canadian border, and eastward from the Town of Jackman to encompass Long Pond and westward to the Canadian border, in Somerset County and Franklin County.

14

bans all high-impact electric transmission lines from the "Upper Kennebec Region," an area spanning portions of Franklin and Somerset Counties. I.B. 2021, ch. 1, § 5 (effective Dec. 19, 2021). Finally, section 6 of the Initiative enacts 35-A M.R.S. § 3132 (6-E) (2022),[10] which applies sections 4 and 5 retroactively to high-impact electric transmission line projects on which construction had not started by September 16, 2020. I.B. 2021, ch. 1, § 6 (effective Dec. 19, 2021). Though the Initiative does not expressly mention the Project, sections 4 and 5 apply to the Project through section 6 because construction did not begin on it until January 2021.

## D.    Procedural History

[¶24] On November 3, 2021, the day after the public referendum on the initiated bill, NECEC (i.e., NECEC Transmission LLC and Avangrid) filed a three-count verified complaint against the State parties seeking declaratory

---

I.B. 2021, ch. 1, § 5 (effective Dec. 19, 2021).

[10]  Section 6 states in full as follows:

> **Sec. 6.  35-A MRSA §3132, sub-§6-E** is enacted to read:
>
> **6-E. Retroactivity**.  Notwithstanding Title 1, section 302 or any other provision of law to the contrary, subsections 6-C and 6-D apply retroactively to September 16, 2020 and apply to any high-impact electric transmission line the construction of which had not commenced as of that date.

I.B. 2021, ch. 1, § 6 (effective Dec. 19, 2021).

and injunctive relief to permanently block retroactive application of the Initiative to the Project. That same day, NECEC moved for a preliminary injunction to stay the initiated legislation during the pendency of the litigation. Several organizations and individuals moved to intervene; five supported NECEC, and eight supported the State parties. After expedited briefing and argument, the Business and Consumer Docket denied NECEC's motion for a preliminary injunction on December 16, 2021. In a comprehensive and thoughtful opinion, the court rejected the various constitutional challenges to the initiated legislation and found "no basis to block the Initiative from going into effect as scheduled." However, the court also suggested that NECEC and the supporting intervenors move to have the questions of law reported to us pursuant to M.R. App. P. 24(c).

[¶25] On December 22, 2021, NECEC moved for the court to report the interlocutory ruling denying its request for a preliminary injunction. M.R. App. P. 24(c). Less than a week later, the court reported the case "in its entirety for the Law Court to determine the questions of law presented."

## II. DISCUSSION

### A. Scope of Appellate Review under Rule 24(c)

[¶26] Rule 24(c) of the Maine Rules of Appellate Procedure governs reported interlocutory rulings and is an exception to the final judgment rule. As such, it should be used sparingly, *Bank of Am., N.A. v. Cloutier*, 2013 ME 17, ¶ 8, 61 A.3d 1242, especially to report constitutional questions, *Sirois v. Winslow*, 585 A.2d 183, 185 (Me. 1991).[11] Rule 24(c) provides:

> If the trial court is of the opinion that a question of law involved in an interlocutory order or ruling made by it ought to be determined by the Law Court before any further proceedings are taken, it may on motion of the aggrieved party report the case to the Law Court for that purpose and stay all further proceedings except such as are necessary to preserve the rights of the parties without making any decision therein.

M.R. App. P. 24(c). Upon receipt of a Rule 24(c) report, our broad task is to determine whether accepting the report and answering the questions of law therein "'is consistent with our basic function as an appellate court, or would improperly place us in the role of an advisory board.'" *Littlebrook Airpark Condo. Ass'n*, 2013 ME 89, ¶ 9, 81 A.3d 348 (quoting *Cloutier*, 2013 ME 17, ¶ 8,

---

[11] Former Rule 72 of the Maine Rules of Civil Procedure governed the process for reporting cases to the Law Court before the Maine Rules of Appellate Procedure were adopted in 2001. M.R. Civ. P. 72 (West 2001); *see* M.R. App. P. 1 Advisory Note, Jan. 1, 2001. Because Rule 24 is "derived nearly verbatim from former" Rule 72, 3A Harvey & Merritt, *Maine Civil Practice* § A24:1 at 224 (3d, 2021-2022 ed. 2021), we consider cases that examined former Rule 72 when interpreting Rule 24. *Liberty Ins. Underwriters, Inc. v. Est. of Faulkner*, 2008 ME 149, ¶ 5 n.4, 957 A.2d 94; *see, e.g.*, *Littlebrook Airpark Condo. Ass'n v. Sweet Peas, LLC*, 2013 ME 89, ¶ 13, 81 A.3d 348.

61 A.3d 1242).    We weigh three factors to make that determination: "(1) whether 'the question reported is of sufficient importance and doubt to outweigh the policy against piecemeal litigation'; (2) whether 'the question might not have to be decided because of other possible dispositions'; and (3) whether 'a decision on the issue would, in at least one alternative, dispose of the action.'" *Id.* (quoting *Cloutier*, 2013 ME 17, ¶ 8, 61 A.3d 1242).

[¶27]   Here, the court reported its order denying NECEC's motion to preliminarily enjoin the Initiative "in its entirety" and did not submit specific questions.  The court's open-ended report does not prevent us from acting on it.  *See*, *e.g.*, *Luhr v. Bickford*, 661 A.2d 1141, 1141-42 (Me. 1995) (considering whether to accept a report that presented "unspecified questions of law" involved in the trial court's interlocutory order, identifying the operative question of law at issue, and discharging the report after concluding that the question was not doubtful (quotation marks omitted)); *Churchill v. S.A.D. No. 49 Tchrs. Ass'n*, 380 A.2d 186, 189 (Me. 1977) ("So long as the record clearly identifies the issue raised and contains the necessary information to permit a determination of the question, no further particularization is required."); *but see Swanson v. Roman Cath. Bishop*, 1997 ME 63, 16 & n.11, 692 A.2d 441 (Lipez, J., dissenting) (urging caution when deciding whether to accept a

reported case involving constitutional questions and noting that *Luhr* did not involve constitutional claims). It does, however, require us to define the scope of our review before we reach the merits.

[¶28] NECEC urges us to accept three questions on report:[12]

1) Whether the Initiative unlawfully deprives NECEC of a vested right to complete Project construction;

2) Whether the Initiative violates the separation of powers under the Maine Constitution; and

3) Whether the Initiative unlawfully impairs NECEC's rights under the contracts clauses of the United States and Maine constitutions.

[¶29] We limit our analysis to sections 4 through 6 of the Initiative. Section 1 of the Initiative affects the authority of the Bureau to lease public reserved lands by retroactively requiring legislative approval for transmission line leases. I.B. 2021, ch. 1, § 1 (effective Dec. 19, 2021). The Business and Consumer Docket (*Murphy, J.*) vacated the BPL lease based on a determination that it was not validly issued, *Black v. Cutko*,

---

[12] NECEC argues further that we should address all issues involved in the interlocutory ruling including whether NECEC will suffer irreparable harm, whether the balance of harms favors an injunction, and whether the public interest favors an injunction. We disagree. Those questions are fact-bound and would require this Court to apply the abuse-of-discretion and clear-error standards, *see All. for Retired Ams. v. Sec'y of State*, 2020 ME 123, ¶ 12, 240 A.3d 45, which would be inconsistent with the de novo review of legal questions to which a Rule 24(c) report is limited. Moreover, the legal standards governing the grant or denial of a preliminary injunction can be resolved by applying well-established principles of law and, therefore, are not sufficiently doubtful to require our attention. *Despres v. Moyer*, 2003 ME 41, ¶ 14, 827 A.2d 61.

No. BCDWB-CV-2020-29, 2021 WL 3700685 (Me. B.C.D. Aug. 10, 2021), and that decision has been appealed to us, *Black et al v. Bureau of Parks and Lands et al.*, No. BCD-21-257. The constitutionality of the retroactive clause of section 1 of the Initiative, which amends the authority of the Bureau under Title 12, may never have to be decided depending on the outcome of that appeal. Under those circumstances, further consideration of the constitutionality of section 1 of the Initiative would not be consistent with our basic appellate function. *See Littlebrook Airpark Condo. Ass'n*, 2013 ME 89, ¶ 9, 81 A.3d 348.

[¶30] The separation of powers claim requires only a brief explanation. We have recognized the power of a legislative body to enact retroactive legislation that affects the validity of a permit issued by an executive authority. *See, e.g.*, *City of Portland v. Fisherman's Wharf Assocs. II*, 541 A.2d 160, 162-64 (Me. 1988). Neither the CPCN nor any other permit that has been upheld in court as validly issued is necessarily categorically exempt from retroactive legislation. However, the effect of retroactive legislation upon existing proceedings and rights is ultimately for the courts, not the Legislature, to decide. For example, in *Avangrid*, we declared the citizens' initiative at issue there to be invalid because it purported to adjudicate the validity of the CPCN

directly, and thereby exercise judicial power rather than legislative power. 2020 ME 109, ¶ 35, 237 A.3d 882. The Initiative now before us is distinguishable because it is an exercise of legislative power that may affect the validity of the CPCN but leaves judicial review—and the separation of powers— intact.

[¶31] With respect to the contracts clause claim, we decline to address that question because it is governed by established principles of law. *See Kittery Retail Ventures, LLC v. Town of Kittery*, 2004 ME 65, ¶ 38, 856 A.2d 1183 (reciting the well-settled test for resolving contracts clause claims). In other words, the question that the contracts clause claim raises is not sufficiently doubtful "to outweigh the policy against piecemeal litigation." *Littlebrook Airpark Condo., Ass'n*, 2013 ME 89, ¶ 9, 81 A.3d 348 (quotation marks omitted).

[¶32] Thus, we accept and answer only the question whether retroactively applying sections 4 and 5 of the Initiative to the CPCN issued for the Project, as required by section 6, violates the due process clause of the Maine Constitution.

**B.     The vested rights doctrine arises from the Maine Constitution and limits the Legislature's authority to apply laws retroactively.**

[¶33]  Whether retroactive application of the Initiative to the CPCN that the PUC issued for the Project unconstitutionally impairs NECEC's vested rights depends on whether Maine's vested rights doctrine is a constitutional limitation on legislative authority, including citizen initiatives.  We hold that it is.

[¶34]  By its terms, the Initiative applies retroactively to the PUC's authority over projects involving high-impact electric transmission lines on which construction had not started by September 16, 2020, 35-A M.R.S. § 3132(6-E) (2022), and thus it applies to the Project.

[¶35]  The same constitutional limitations on legislative authority apply to citizen-initiated legislation as apply to the enactments of the Legislature. *Opinion of the Justices*, 2017 ME 100, ¶ 59, 162 A.3d 188.  We are mindful that citizen-initiated legislation enjoys a "heavy presumption of constitutionality" and should be construed liberally.  *Id.* (quotation marks omitted).  At the same time, "[s]ince by the initiative process the people of Maine are exercising their legislative power, the constitutional validity of a citizen initiative is evaluated under the ordinary rules of statutory construction."  *League of Women Voters v. Sec'y of State*, 683  A.2d 769, 771 (Me. 1996).

22

[¶36] "If the Legislature intends a retroactive application, the statute must be so applied unless the Legislature is prohibited from regulating conduct in the intended manner, *and such a limitation upon the Legislature's power can only arise from the United States Constitution or the Maine Constitution.*" *Norton v. C.P. Blouin, Inc.*, 511 A.2d 1056, 1060 n.5 (1985) (emphasis added); *see State v. L.V.I. Group*, 1997 ME 25, ¶ 9, 690 A.2d 960 (characterizing the cited excerpt from *Norton* as "clarif[ying] the proper analysis concerning the retroactive application of statutes"); *cf. Opinion of the Justices*, 103 Me. 506, 508, 69 A. 627 (1907) ("[L]aws and regulations are to be held valid unless there can be pointed out some provision in the State or United States Constitution which clearly prohibits them.").

[¶37] The principal parties accept *Norton*'s directive but disagree about the provenance of Maine's vested rights doctrine. NECEC argues that the doctrine is grounded in the due process clause of the Maine Constitution, Me. Const. art. I, § 6-A, and that it therefore limits the Legislature from applying the Initiative retroactively. The State appellees contend instead that the vested rights doctrine is a creature of common law that citizens, acting as the Legislature, may—and did—abrogate by clear enactment.

**1.    The vested rights doctrine and the due process clause of the Maine Constitution.**

[¶38]   Contrary to the State appellees' arguments, the protection of vested rights has been rooted in the Maine Constitution since Maine became a state.  *See* David M. Gold, *The Tradition of Substantive Judicial Review: A Case Study of Continuity in Constitutional Jurisprudence*, 52 Me. L. Rev. 355, 364-70 (2000) (chronicling the history of Maine's vested rights jurisprudence).  We first considered the legal significance of vested rights just three years after the Maine Constitution took effect, in *Proprietors of Kennebec Purchase v. Laboree*, 2 Me. 275, 288-93 (1823).  There, we considered the constitutionality of retroactively applying a statute changing the doctrine of disseisin that would have resulted in a deeded owner losing his land.  *Id.* at 286-93.  In describing the effect of the statute, we discussed article 1, section 1 of the Maine Constitution:

> By the spirit and true intent and meaning of this section, every citizen has the right of "possessing and protecting property" according to the standing laws of the state in force at the time of his "acquiring["] it, and during the time of his continuing to possess it. Unless this be the true construction, the section seems to secure no other right to the citizen than that of being governed and protected in his person and property by the laws of the land, for the time being. . . . The design of the framers of our constitution, it would seem, was . . . to guard against the retroactive effect of legislation upon the property of the citizens.

24

*Id*. at 290 (quoting Me. Const. art. 1, § 1).  We proceeded to hold that retroactively applying the challenged statute was unconstitutional to the extent that it altered the common law "because such operation would impair and destroy vested rights, and deprive the owners of real estate of their titles thereto, by changing the principles and the nature of those facts, by means of which those titles had existed and been preserved to them in safety."  *Id.* at 294-95.

[¶39]  Since *Laboree*, we have continued to frame vested rights in constitutional terms, albeit broadly and often without reference to any specific provision of the Maine Constitution.  In *Coffin v. Rich*, 45 Me. 507, 514-16 (1858), we relied on *Laboree* to hold that a statute making individual stockholders personally liable for corporate debts was unconstitutional as applied retroactively because it created a new liability where none had previously existed.  We explained:

> There can be no doubt that Legislatures have the power to pass retrospective statutes, if they affect remedies only.  Such is the well settled law of this State.  But they have no constitutional power to enact retrospective laws which impair vested rights, or create personal liabilities.

*Id.* at 514-15; *see Thut v. Grant*, 281 A.2d 1, 6 (Me. 1971) ("[T]he Legislature has full power and authority to regulate and change the form of remedies in actions

if no vested rights are impaired or personal liabilities created. There is no constitutional inhibition against the enactment of retroactive legislation which affects remedies only." (emphasis and quotation marks omitted)). We relied on *Coffin* in *Sabasteanski v. Pagurko*, 232 A.2d 524, 525-26 (Me. 1967), where we held that a statute validating deeds with certain administrative defects was unconstitutional as applied retroactively because it effectively ousted subsequent innocent purchasers of their right to property.

[¶40] In *Adams v. Palmer*, 51 Me. 480 (1863), we identified a provision of the Maine Constitution as protecting vested rights different from the one we identified in *Laboree*. In *Adams*, a widow had, while she was still a minor, released her right of dower to a parcel of land by joining in a deed with her husband. *Id.* at 487. Because she was a minor when she signed the deed, the deed was voidable by her. *Id.* at 489. After she became an adult, the Legislature enacted a statute providing that a minor's release of a right of dower was valid. *Id*. at 490. We held the statute was unconstitutional as applied retroactively. *Id*. We reasoned that the adult widow's right to recover a freehold estate upon her husband's death was a vested property right. *Id.* We implied that the widow's vested right was protected by the guarantee in article I, section 6 of the Maine Constitution "that no one shall 'be deprived of his life, liberty,

26

property, or privileges, but by the judgment of his peers or the laws of the land.'"

*Id.* (quoting Me. Const. art. 1, § 6 (emphasis omitted)).[13]

[¶41]  Against this historical backdrop, NECEC argues that vested rights are properly viewed as arising from the Maine Constitution's due process clause, article I, section 6-A.  We agree.  Though our decisions in *Laboree* and *Adams* predate the adoption of section 6-A, *see* 1965 Me. Laws 1163 (Proclamation of the Governor of Maine), their logic recognizes implied due process protections in article I, sections 1 and 6 that guard against retroactivity. In *Laboree* we interpreted section 1 as protecting a person's inherent right to possess and protect property "according to the standing laws of the State in force at the time of his acquiring it, and during the time of his continuing to possess it." *Laboree*, 2 Me. at 275, 290 (quotation marks omitted).  The essence of that right is due process.  *Cf. Hammond v. Temp. Comp. Rev. Bd.*, 473 A.2d 1267, 1272 (Me. 1984) (observing that a party alleging a due process violation

---

[13] *See also Austin v. Stevens*, 24 Me. 520, 529 (1845) ("While the exercise of the legislative power is admitted to be both constitutional and expedient, to determine what shall be the respective rights and duties of tenants for life, and of reversioners in relation to improvements made during the continuance of the estate for life, it will not follow, that their rights to such improvements can be altered or changed, after they have been fixed and established by the laws existing at the time, when the life estate falls.  The right of the legislative department to authorize a person holding lands by possession and improvement, to claim and obtain compensation for his improvements has been admitted.  But if he should voluntarily abandon his improvements with the land, and they should by the existing laws, as they would now do, become the property of the owner of the estate, would any intelligent person claim for the legislature the constitutional power to deprive the owner of any portion of his estate except for public use?").

"must be able to point to existing law or rules, or mutual understandings, wherein his claims of entitlement are secured and may be supported"); Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 356 (1868) ("Due process of law in each particular case means, such an exertion of the powers of government as the settled maxims of law sanction . . . ."); *cf. Tinkle, The Maine State Constitution* 29 (2d ed. 2013) (observing that section 1 "has been perceived as a catchall for fundamental rights not otherwise enumerated in Article I"). In *Adams*, we analogized section 6's protection of vested property rights to the due process clause in the New York constitution that that state's high court relied on to reject a retroactive law as unconstitutional. *See Adams*, 51 Me. at 492-93 (citing *Westervelt v. Gregg*, 12 N.Y. 202 (1854)).[14] Moreover, this court has long equated sections 6's "law of the land" clause with "due process of law." *See, e.g.*, *State v. Knight*, 43 Me. 11, 122 (1857) (defining "law of the land" as "the due course and process of law" (quotation marks omitted)); *State v. Doherty*, 60 Me. 504, 509 (1872) ("'[D]ue process of law' and 'law of the land' have the same meaning."); *Jordan v. Gaines*,

---

[14] Further, *Adams* characterized our decision in *Laboree* as approving the due process principles upon which other courts had rejected retroactive legislation as "denying the power of the Legislature to take away vested rights." *Adams v. Palmer*, 51 Me. 480, 493 (Me. 1863).

136 Me. 291, 294, 8 A.2d 585 (1939) ("'[D]ue process of law' and 'the law of the land' are identical in meaning. They are of equivalent import and interchangeable." (citations omitted)).

[¶42] Thus, sections 1 and 6 of the Maine Constitution's Declaration of Rights were proxies for due process protections of vested rights until section 6-A was adopted in 1963. *Cf.* L.D. 33 (101st Legis. 1963) ("A due process clause . . . should be added to the Maine Constitution. . . . It may well be said that in various places within the Declaration of Rights, as the same is now written, much of the protection given by the proposed new due-process clause appears. However, the rights with which we are here concerned are so fundamental and so important that if there is a second or repeat guarantee, such underwriting of protection is, we believe, all to the good."). Constitutional protection of vested rights properly resides in Maine's due process clause. *Cf. Tinkle, The Maine State Constitution* 45 (2d ed. 2013) ("With the incorporation into the state constitution of section 6-A, which expressly contains a due process clause, the law of the land clause [in section 6] has become doubly redundant and fallen into desuetude.") We conclude that the vested rights doctrine "arises from" the Maine Constitution such that it constrains the power to enact retroactive legislation.

### 2. NECEC's vested rights claim to develop the Project under the terms of the CPCN

[¶43]   Sections 4 through 6 of the Initiative relate to 35-A M.R.S. § 3132(6), which directs the PUC to determine whether a proposed transmission line project serves an identified "public need."  I.B. 2021, ch. 1, §§ 4-6 (effective Dec. 19, 2021).  Section 4 adds a requirement to the statute for legislative approval "[i]n addition to obtaining a [CPCN]."  *Id.* § 4.  Section 5 categorically bans construction of high-impact electric transmission projects in the "Upper Kennebec Region."  *Id.* § 5.  Section 6 makes sections 4 and 5 of the Initiative applicable to all high-impact electric transmission lines on which construction had not started by September 16, 2020.  *Id.* § 6.  Because NECEC started construction on the Project some four months after September 16, 2020, the retroactivity provision in section 6 directly impairs NECEC's ability to proceed with Project construction pursuant to the terms of the CPCN issued under then-existing law.

[¶44]   The issue before us involves the intersection of NECEC's private interest to proceed and the interest of the electorate to determine public legislative policy.  The applicability of the vested rights doctrine here turns on whether NECEC acquired a cognizable property right that the Maine Constitution protects from being impaired by retroactive legislation.

*See* J. Spencer Hall, *State v. Vested Rights Statutes: Developing Certainty and Equity and Protecting the Public Interest*, 40 Urb. Law. 451, 455-56 (2008) ("'Vested rights are rights vested in specific individuals in accordance with the law in what the law recognizes as *property*.' Critical to the application of the doctrine of vested rights, then, is a definition of what constitutes property. . . . James Madison viewed property as embracing 'everything to which a man may attach a value and have a right.'" (quoting Edward S. Corwin, *The Basic Doctrine of American Constitutional Law*, 12 Mich. L. Rev. 247, 271 (1914) (footnotes omitted)).

[¶45] NECEC urges us to look at the Project as a whole, arguing that it has a vested right to complete construction of the entire Project. But the question presented in this case and which we proceed to answer is narrower. We limit our vested rights analysis to the specific approval that the retroactivity provision in section 6 of the Initiative affected. The Initiative retroactively imposes a requirement of legislative approval for a CPCN previously granted by the PUC. It does nothing to affect the other permits or approvals that NECEC needs before it may complete the Project, many of which are still the subject of

pending proceedings.[15]   In other words, the focus of a vested rights analysis must be upon the specific entitlement that is affected by the retroactively applied legislation.   Thus, the fact that NECEC had not obtained all required municipal permits at the time this case was filed does not bear on whether NECEC has acquired a constitutionally protected property right to continue the work authorized by the CPCN.   Nevertheless, NECEC's ability to complete the entire Project is contingent on obtaining any remaining permits needed, assuming that NECEC has, in fact, acquired a vested right to proceed as authorized by the CPCN's terms and conditions.

[¶46]   In Maine and other states, the right to proceed with construction in the municipal-law context vests once a developer undertakes significant, visible construction in good faith and with the intent to carry construction through to completion as authorized by a validly issued building permit. *Sahl v. Town of York*, 2000 ME 180, ¶ 12, 760 A.2d 266; *see* J. Spencer Hall, *State Vested Rights Statutes: Developing Certainty and Equity and Protecting the Public Interest*, 40 Urb. Law. 451, 459-94 (2008) (surveying state statutes codifying the vested rights doctrine).   That permit must be final and not subject to direct

---

[15]   Section 1 of the Initiative enacts retroactive standards for the grant of the BPL lease, but we do not address that issue because there is a separate appeal before us from the order vacating the grant of the lease.  *Black et al. v. Bureau of Parks and Lands et al.*, No. BCD-21-257.

or further appeal. *Powell v. Calvert County*, 795 A.2d 96, 101 (Md. 2002) ("[A] special exception approval, whose validity is being litigated, is not finally valid until all litigation concerning the special exception is final. Persons proceeding under it prior to finality are not 'vesting' rights; they are commencing at 'their own risk' so that they will be required to undo what they have done if they ultimately fail in the litigation process.") We have applied the test announced in *Sahl* only to resolve a vested rights challenge to retroactive changes in local zoning ordinances affecting a project of limited scale; we have never applied it to changes in state law affecting large-scale infrastructure projects overseen by a matrix of local, state, and federal authorities. Still, *Sahl's* underlying rationale for protecting a developer's good-faith expenditures in reliance on government approval of proposed investments against retroactive changes is not limited to zoning law and informs our analysis of whether NECEC has a vested right to proceed with Project construction under the terms of CPCN.

[¶47] Thus, in the context of large-scale infrastructure development, we conclude that a claim of unconstitutional impairment of vested rights arises under the following conditions. First, the claimant holds a validly issued and final permit, license, or other grant of authority from a governmental entity that is not subject to any further judicial review. Second, the law under which the

permit, license, or other grant of authority was issued changed thereafter and would, if applied retroactively, eliminate or substantially limit the right to proceed with the activity authorized by the permit. Third, the claimant undertook substantial good-faith expenditures on the activity within the scope of the affected permit prior to the enactment of the retroactive legislation, meaning that the expenditure was made (1) in reliance on the affected permit or grant of authority, (2) before the law changed, and (3) according to a schedule that was not created or expedited for the purpose of generating a vested rights claim.[16]

[¶48] Here, the PUC determined that there was a public need for the Project and issued the CPCN on May 3, 2019. We affirmed the issuance of the CPCN on March 17, 2020, holding that the PUC followed the proper procedure and made the public-need determination based on sufficient record evidence. *See NextEra Energy Res., LLC*, 2020 ME 34, ¶ 43, 227 A.3d 1117.

---

[16] The State parties argue that so long as there is a rational basis for the Initiative, the vested rights claim fails. We disagree. If the effect of the retroactive legislation is to abrogate vested rights, the rationale and basis for the legislation become irrelevant. *See Muskin v. State Dep't of Assessments & Tax'n*, 30 A.3d 962, 969 (Md. 2011) (Under the Maryland Constitution, "[i]f a retrospectively-applied statute is found to abrogate vested rights or takes property without just compensation, it is irrelevant whether the reason for enacting the statute, its goals, or its regulatory scheme is 'rational.'").

34

[¶49]  The facts before us were generated in connection with NECEC's request for preliminary injunctive relief; they have not been finally adjudicated. Nonetheless, the record indicates at least preliminarily that NECEC began construction on January 18, 2021, after having secured the CPCN and all other necessary, Project-wide approvals from various state and federal authorities. The CPCN was the only approval that was affirmed after appellate review and not subject to any further appeals.  There is substantial evidence that NECEC proceeded with construction thereafter in good-faith reliance on those approvals and intended to develop the Project to completion.  NECEC's construction efforts were consistent with the baseline schedule that was first set in the transmission service agreements governing Project construction and that was later amended to reflect permitting delays.  As of November 2, 2021, the day Maine voters approved the initiated bill, NECEC had cut around 124 miles of the Project corridor and erected multiple transmission structures, spending nearly $450 million or forty-three percent of the total project cost estimate at that time.  NECEC spent that significant sum with the PUC's assurance in issuing the CPCN that the Project served the public need.

[¶50]  Our decision affirming the PUC's public-need determination enshrined it in a final judgment—in effect providing NECEC added assurance

not only that the CPCN complied with then-existing law but also that NECEC could proceed with Project construction according to its terms. To be sure, those terms anticipated additional oversight by other government entities; in its order granting the CPCN, the PUC stated that it "expects that the scenic and recreational impacts of the [Project] will be reviewed and, to the extent appropriate and feasible, mitigated through the processes at the Maine Department of Environmental Protection (DEP) and the Land Use Planning Commission (LUPC)." *Central Maine Power Co.*, Request for Approval of CPCN for the New England Clean Energy Connect, No. 2017-00232, Order (Me. P.U.C. May 3, 2019); *see* 35-A M.R.S. § 3132(6), (7) (acknowledging the DEP's authority to modify the location, size, character, and design of transmission line projects that the PUC has already determined serve an identified public need). Obtaining the CPCN alone was necessary but not sufficient to confer the right to *complete* construction. However, we hold that NECEC could reasonably rely on the CPCN, and our judgment affirming the CPCN, as valid authorization to *begin* construction such that its right to proceed according to the CPCN's terms could vest upon evidence that it undertook significant, visible construction in good faith, according to a schedule that was not created or expedited for the purpose of generating a vested rights claim.

[¶51]   To be clear, we do not decide whether NECEC performed substantial construction in good faith[17] according to a schedule that was not created or expedited for the purpose of generating a vested rights claim. Although it appears from the limited record developed in connection with the request for preliminary injunctive relief that NECEC did so, it is up to the trial court to make those factual determinations on remand.

### III.  CONCLUSION

[¶52] We conclude that section 6 of the Initiative, as applied retroactively to the CPCN, would infringe on NECEC's constitutionally-protected vested rights if NECEC can demonstrate by a preponderance of the evidence that it engaged in substantial construction of the Project in good-faith reliance on the authority granted by the CPCN before Maine voters approved the initiated bill

---

[17]   The State appellees argue that because NECEC was aware of widespread opposition to the Project and knew that the Secretary of State had issued a petition allowing the Initiative's proponents to collect signatures in October 2020, it could not have proceeded with construction on January 18, 2021, in good faith.  We do not accept the argument's implicit premise that, to be acting in good faith, a developer must wait to commence construction pursuant to a valid permit if there is a possibility that a retroactive change in the law could affect the right to complete a project.  As of January 2021, all that existed was a petition in circulation.  There was no indication whether sufficient signatures had been gathered for the ballot measure to be presented to the Secretary of State, whether the Secretary of State would certify that the petition had garnered enough valid signatures to be presented to the Legislature, or whether the Legislature (or Maine voters acting in its stead) would approve the then-hypothetical initiative.  In contrast, in *Kittery Retail Ventures, LLC v. Town of Kittery*, the developer submitted its revised plan to the Planning Board after a citizen amendment to the zoning ordinance was passed and enacted but before its effective date.  2004 ME 65, ¶ 5, 856 A.2d 1183.  The potential that a prospective citizens' initiative might be voted into law after the CPCN was final is far too attenuated to defeat good faith.

by public referendum. Even then, NECEC's vested right to proceed with the Project would not be absolute; what would be protected would be NECEC's right to move forward under the terms of the validly issued CPCN as granted under then-existing law.

[¶53] We emphasize that our analysis and conclusions are not based on the wisdom of either the Project or the Initiative. *See Avangrid Networks, Inc.*, 2020 ME 109, ¶ 10, 237 A.3d 882. On this report of an interlocutory ruling pursuant to M.R. App. P. 24(c), the limited question that we answer is this:

> Would retroactively applying sections 4 and 5 of the Initiative, to the CPCN issued for the Project, as required by section 6 of the Initiative, violate the due process clause of the Maine Constitution, if NECEC undertook substantial construction consistent with and in good-faith reliance on the CPCN before the Initiative was enacted?

Our answer is yes.

The entry is:

> Report accepted as to one question, which is answered in the affirmative as indicated in the opinion. Remanded for further proceedings consistent with this opinion.

Timothy C. Woodcock, Esq. (orally), P. Andrew Hamilton, Esq., Jonathan A. Pottle, Esq., and Casey M. Olesen, Esq., Eaton Peabody, Bangor, for appellant H.Q. Energy Services (U.S.) Inc.

John J. Aromando, Esq. (orally), Jared S. des Rosiers, Esq., Joshua D. Dunlap, Esq., and Sara A. Murphy, Esq., Pierce Atwood LLP, Portland, for appellants NECEC Transmission LLC and Avangrid Networks, Inc.

Gerald F. Petruccelli, Esq., and Scott D. Dolan, Esq., Petruccelli, Martin & Haddow, LLP, Portland, for appellant Maine State Chamber of Commerce

Sigmund D. Schutz, Esq., Anthony W. Buxton, Esq., Robert B. Borowski, Esq., and Jonathan Mermin, Esq., Preti Flaherty Beliveau & Pachios LLP, Portland, for appellant Industrial Energy Consumer Group

Philip M. Coffin III, Esq., Jeffrey D. Russell, Esq., and Cyrus E. Cheslak, Esq., Lambert Coffin, Portland, for appellant Cianbro Corporation

Benjamin K. Grant, Esq., McTeague Higbee, Topsham, and Robert M. Cheverie, Esq., Robert M. Cheverie & Associates, P.C., Hartford, Connecticut, for appellant International Brotherhood of Electrical Workers Local 104

Aaron M. Frey, Attorney General, and Jonathan R. Bolton, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellees Bureau of Parks and Lands, Maine Public Utilities Commission, Maine House of Representatives, and Maine Senate

Christopher T. Roach, Esq. (orally), Roach Ruprecht Sanchez & Bischoff, P.C., Portland, for appellee NextEra Energy Resources, LLC

James T. Kilbreth, Esq. (orally), David M. Kallin, Esq., Jeana M. McCormick, Esq., Sara P. Cressey, Esq., and Oliver Mac Walton, Esq., Drummond Woodsum, Portland, for appellees Thomas B. Saviello, Christine M. Geisser, Wendy A.

Huisch, Jonathan T. Hull, Theresa E. York, Robert C. Yorks, and the Natural Resources Council of Maine

Orlando E. Delogu, amicus curiae pro se

Dmitry Bam, amicus curiae pro se

James L. Costello, Esq., and Jason J. Theobald, Esq., Curtis Thaxter LLC, Portland, for amici curiae former commissioners of the Maine Public Utilities Commission

Timothy Norton, Esq., and Shea H. Watson, Esq., Kelly, Remmel & Zimmerman, Portland, and David S. Rosenzweig, Esq., Keegan Werlin LLP, Boston, Massachusetts, for amici curiae NStar Electric Company, Massachusetts Electric Company and Nantucket Electric Company, and Fitchburg Gas and Electric Light Company

Elizabeth A. Boepple, Esq., and Sean R. Turley, Esq., Murray Plumb & Murray, Portland, and Paul W. Hughes, Esq., and Andrew A. Lyons-Berg, Esq., McDermott Will & Emery LLP, Washington, D.C., for amici curiae Calpine Corporation, Vistra Corporation, Holly Bragdon, and Brian Ahern.

Stacy O. Stitham, Esq., and Eamonn R.C. Hart, Esq., Brann & Isaacson, Lewiston, for amicus curiae City of Lewiston

Timothy A. Pease, Esq., and Jonathan P. Hunter, Esq., Rudman Winchell, Bangor, for amici curiae Susan Austin, Susan Bernard, Jon Connor, Steve Foster, Peter Lyford, Beth O'Connor, Nathan Wadsworth, Dustin White, Harold Stewart III, and Andre Cushing

Brett D. Baber, Esq., Lanham Blackwell & Baber, PA, Bangor, for amicus curiae Robert J. Weiner

Richard Anderson, Walter Anderson, Richard Barringer, Lloyd Irland, Ellen Pope, Tom Rumpf, and Sam Zaitlin, amici curiae pro se

Business and Consumer Docket docket number BCD-CIV-2021-00058
For Clerk Reference Only